**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Joseph RUSSO, Defendant-Appellant.**

**No. 72–1846.**

United States Court of Appeals, Sixth Circuit.

Argued April 10, 1973.

Decided July 6, 1973.

John D. O'Connell, Detroit, Mich., Arthur R. Miller, Cambridge, Mass., for defendant-appellant; Phillip Hoffiz, Detroit, Mich., on brief.

Richard L. Delonis, Asst. U. S. Atty., for plaintiff-appellee; Ralph B. Guy, Jr., U. S. Atty., Detroit, Mich., on brief.

Before PHILLIPS, Chief Judge, and KENT [*] and LIVELY, Circuit Judges.

LIVELY, Circuit Judge.

Appellant, Joseph Russo, is an osteopathic physician licensed to practice in Michigan. He and an associate were charged in a single indictment containing 51 counts of violating the mail fraud statute, 18 U.S.C. § 1341. Count one of the indictment was divided into paragraphs I and II. Paragraph I charged that the two physicians "devised and intended to devise a scheme and artifice to defraud Blue Shield of Michigan, . . . by filing claims for services not performed on patients on dates specified and for obtaining money from such organization by false and fraudulent pretenses and representations well knowing at the time that the pretenses and representations would be and were false when made." Subparagraphs A through G set forth in detail the manner in which the alleged scheme and artifice to defraud was carried out. Paragraph II of Count one then recited that on July 14, 1966 at Detroit in the Eastern District of Michigan the defendant, Joseph Russo, did knowingly and willfully cause Blue Shield of Michigan to mail a check, identified by number, to him in violation of the mail fraud statute. Each of the subsequent 50 counts realleged and adopted the allegations of paragraph I of Count one and in its paragraph II charged one or the other of the named defendants with willfully causing a check to be placed in the mail by Blue Shield of Michigan for delivery to that defendant. No conspiracy was charged in the indictment.

The evidence reveals that during the period covered by the indictment which was part of the year 1966, all of 1967 and part of 1968 Dr. Russo leased a group of offices in the basement of a building in a "blue-collar" neighborhood in Detroit. These offices, referred to in the testimony as Dr. Russo's clinic, consisted of four examination rooms, an office and a long hallway where patients waited. Although Dr. Russo was associated with several other doctors in a partnership known as The Midwest Clinical Group, only one of the other members of that partnership practiced in the same building with Dr. Russo and there was no sharing of facilities or personnel by them. The Midwest Clinical Group was a loose sort of arrangement in which each of the partners contributed income for the purpose of maintaining one or more osteopathic hospitals in Detroit. It appears from the testimony that the doctors who belonged to the Midwest Clinical Group had problems obtaining hospital beds for their patients and that it was necessary for them to operate, through the partnership, hospitals known as Palmer East and Palmer West for the treatment of their patients. Although the testimony indicates that the Midwest Clinical Group received a portion of its funds from Dr. Russo, presumably including payments from Blue Shield of Michigan which the indictment charges were procured by fraud, there is no evidence that any other member of the Midwest Clinical group was involved in, or had any

[*] Judge Kent participated in the hearing of this case but died on May 28, 1973 and did not participate in the decision.

knowledge of, the scheme charged in the indictment. The co-defendant, Dr. Lieberwitz, was not a member of the Midwest Clinical Group, but was an employee of Dr. Russo.

The Russo office or clinic was kept open throughout the day until late at night and hundreds of patients were seen in a single day. Most of the time Dr. Russo had at least two other doctors working for him in the clinic and each worked on certain days during the week. The other doctors who worked for Dr. Russo gave him a portion of their gross receipts and paid none of the overhead expenses of the offices. The co-defendant who was indicted and tried with Dr. Russo was a younger osteopathic physician who testified to treating an average of 150 patients per day while working at Dr. Russo's office and who stated that he often stayed until 1:00 or 2:00 o'clock in the morning since the office was never closed as long as there were any patients waiting to be seen. Several of the doctors who had worked at the clinic testified that it was Dr. Russo's office and that when they came to work, all of the patients were Dr. Russo's patients, although after they had been there a while some of the patients became theirs. Several witnesses attributed the large number of daily patients at the Russo clinic to the fact that it was located in a densely populated section of Detroit where few doctors' offices were situated.

It was testified that Blue Shield of Michigan furnishes to the doctors who practice in that state printed forms known as "Doctor Service Reports" (hereafter DSR). In order to be paid by Blue Shield it is necessary for a doctor to complete a DSR for each treatment and submit it for payment. Each doctor is assigned a provider's code number and this and his name are both imprinted on the DSR's furnished to him by Blue Shield. The DSR is completed by filling in the name of the patient, the name of the subscriber, which might be different from that of the patient, and the address, identification number and certain other statistical data of the subscriber. Often the subscriber is the employer of the patient. In addition, the treating physician must indicate the date of the service and a description of the service rendered together with a diagnosis. Each physician is supplied with a manual containing approximately 8,000 different procedures with a four-digit code number for each such procedure. There is an established fee which Blue Shield agrees to pay for each particular type of medical service under its various contracts, and the amount of its liability is determined by the procedure code number and description of services performed as indicated on the DSR. Not all medical services are covered by Blue Shield and the coverage can vary between contracts of various subscribers.

The prosecution did not contend that the appellant submitted DSR's to Blue Shield for patients that he had not seen on the dates indicated. What was contended was that in many cases the treatment received by the patients was of such a nature that it was not covered by Blue Shield and was not compensable under the particular subscriber contract involved and that if the services actually performed had been disclosed on the DSR, no payment would have been due from Blue Shield. Instead of making a charge to the patient for the actual services which were not compensable under the patient's Blue Shield coverage, it was the contention of the prosecution that the defendants caused a DSR to be prepared showing that some procedure had been followed with the patient which would have been compensable.

The prosecution produced 12 former patients of Dr. Russo and Dr. Lieberwitz who testified concerning their visits to the clinic and the treatment which they received. Some of the testimony related to acts referred to in particular counts of the indictment and some related to similar acts not charged in the indictment. Each of these patients was asked to identify a number of DSR's submitted by Dr. Russo or his co-defend-

ant upon which payment had been received. Each of the witnesses identified his or her signature on the DSR and was then asked about the treatment or services received at the clinic. In each case the treating doctor had reported administering a treatment involving either aspiration of a hematoma or bursa, or arthrocentesis. The aspiration of the bursa was usually described in the DSR's as being applied to one of the shoulders or one of the hips. This procedure involves withdrawal of a fluid from the bursa or hematoma by means of either one or two needles. Arthrocentesis, which is the injection of a steroid or other substance into a joint, was described in the reports as being applied variously to either shoulder, as well as both hips and ankles.

These twelve witnesses testified that they went to the clinic because of colds, bronchitis, low blood pressure, weight loss, a broken finger, backache, hurting in the right side, asthma, kidney infection, and arthritis. Without exception, they testified that the only injections they received from Drs. Russo and Lieberwitz were cold shots and ordinary inoculations in the fleshy part of the hip and arm and that they never received any injections into the shoulder or hip joints. A number of the witnesses testified that they were asked by the doctor before receiving the first treatment whether they were allergic to penicillin. Likewise those patients who actually observed the treatment stated that no fluid of any kind was withdrawn by the doctors. Each of them who was asked estimated that his treatment took a very brief time and except for one witness who had arthritis, the testimony was that none had complaints concerning limbs or joints. Floyd Newkirk, the witness who had arthritis, stated that he received no shots in his shoulder and that no fluid was ever withdrawn during any of his treatment. These witnesses agreed on cross-examination that they felt better after being treated at Dr. Russo's clinic. Ordinary injections of medicines made in a doctor's office are not compensable by Blue Shield. However, both arthrocentesis and aspiration of the bursa and hematoma are considered to be surgical procedures and are covered. The defense produced 101 patient witnesses who described the treatment they received at Dr. Russo's clinic and in many cases they were victims of arthritis and bursitis who were treated by aspiration and arthrocentesis. On cross-examination, a number of these witnesses stated that bursitis and arthritis are very painful and that a person knows it if he has one of these ailments.

In addition to patient witnesses the prosecution produced the Director of Service Review of Blue Shield of Michigan, Charles Smith. Mr. Smith testified that the prime objective of his department is to insure the integrity of the reporting forms (DSR's) submitted to Blue Shield by doctor-providers of care. He stated that this is done by various audits and investigative procedures initiated by his department. He considered the DSR to be the basic document in the claims procedure of Blue Shield. It was described as a perforated carbon form which permits the doctor to retain a copy while submitting the original to Blue Shield for payment. This witness went through the internal billing procedures at Michigan Blue Shield in great detail. It was pointed out that each DSR is examined by several different people to determine that it is complete and proper for payment. If a claims examiner determines that it is in all respects complete and correct the appropriate amount of money for the particular service is recorded and the examiner initials and dates the DSR. From that point the form is taken to the data recording section where the information from it is recorded onto a magnetic tape for further processing.

After this information has been stored on magnetic tape the claim form itself is microfilmed and there is a cross reference made between the information on the magnetic tape to be used by the computer and the microfilm copy of the

original document. The original DSR is then destroyed. Each two weeks checks are written by the computer based on the information contained on the magnetic tapes. The computer retrieves all of the payments due each doctor under his provider code number and a check is printed out with a voucher attached which indicates part of the same information which had originally appeared on the DSR. Included are an identification of the patient, the date of treatment and the procedure code number. Each check can include payment for a maximum of 17 claims, each representing a separate DSR filed by that particular doctor-provider. Mr. Smith testified that the checks are distributed to the doctors through the United States mail and that neither Dr. Russo nor the co-defendant had ever received a check in any other manner. The witness described a number of cross-checks and verification procedures followed by Blue Shield of Michigan to insure accuracy. While admitting that a computer output is no better than the information fed into it, he pointed out that two different key punch operators work from each DSR and that the work of each is compared with the other before information is finally put into the computer. This witness stated that since all claims payments are based on the correct processing of DSR's it is essential that reliable procedures be followed.

In addition to describing the general procedures of his employer with respect to processing the payment of claims, this witness offered to testify about particular statistics which had been gathered by Blue Shield concerning Dr. Russo and Dr. Lieberwitz and relating certain of their claims during the period in question to the total claims for the same procedures received by Blue Shield of Michigan during that period of time. In order to qualify this testimony, Francis Mrachina, the vice president of Michigan Blue Shield in charge of all computer functions, testified. He described the computer equipment used by his employer and its particular functions in the claims processing procedures. Among other things he described the verification which takes place of the input from the DSR to the computer and the daily balancing procedures followed by Michigan Blue Shield. He stated that new programs are pretested before adoption for use in the computers of Michigan Blue Shield. This witness then described an annual statistical survey which the company has produced by computer each year since 1967. This is a computer printout which shows the number of claims paid for each of the compensable procedures covered by Blue Shield contracts in Michigan. The witness stated that the annual statistical run is made in the ordinary course of business by Michigan Blue Shield and that it is the basis of a number of decisions which the organization makes in the conduct of its business.

The witness Smith was then recalled and further described the annual statistical report. He pointed out that while there is a difference in charges by participating and non-participating doctors, virtually all of the 10,000 physicians practicing in Michigan in 1967 filed some claims with Blue Shield. The annual statistical report classifies claims paid by medical procedure and not by identifying the doctor who made the claim. The report contains a great deal of other information of a demographic nature which is used by Blue Shield for various accounting and actuarial purposes.

The witness then stated that another group of records relating to individual doctors is made each year by Michigan Blue Shield. These are called doctors' profiles and they are made up by clerical employees under the supervision of Mr. Smith. The profile is a method by which the organization determines what particular procedures have been reported by an individual physician, and paid for, during a given period of time. Each profile relates to only one doctor and lists each procedure for which he was paid during the period of the report and the number of claims paid for each pro-

cedure. Mr. Smith testified that in any year his organization would prepare approximately 1,200 individual doctor's profiles. Some of these have been constructed by computer operation and some by hand or manual tabulation. He stated that for the year 1967 manually generated profiles were made for Dr. Russo and Dr. Lieberwitz and he described the verification procedures involved to insure accuracy of the profiles. Two of the clerical employees who had constructed the 1967 profiles on the defendants then described in detail the procedures which they had followed. It was testified that a number of reasons might exist for the selection of a particular doctor for a profile in a given year, including the filing of an unusual number of claims, an exceptionally high income, or complaints from patients or other doctors. It was stated that doctor's profiles are done in the ordinary course of business and are routinely used as part of the auditing procedure of Michigan Blue Shield. The employees who actually constructed the Russo profile described the procedures of verification which they followed in doing this job. It was testified that it took two employees approximately one month to construct the 1967 profiles of Drs. Russo and Lieberwitz. This was done early in the year 1968.

The basic document from which the profiles were made was the check voucher. The testimony was that each check voucher issued to the doctor being profiled during the period was examined and that a tabulation was made of each procedure for which payment was made in that particular check. Each doctor profile was complete and covered all procedures identified by code numbers, for which he was paid during the year and no particular procedure was pinpointed for inclusion in the profile. After every procedure for which payment had been made during the period of time had been tabulated from each check voucher issued during the period covered by the profile, the total for each procedure was obtained by use of adding machines. Two tapes were run on each item for verification.

The prosecution then sought to introduce the annual statistical report of Michigan Blue Shield for the year 1967 and the doctor profiles for the year 1967 of Dr. Russo and the co-defendant. Both defendants objected and further hearings were held out of the presence of the jury, consisting of legal arguments and further voir dire examination of the witness Smith. It was brought out that the paid claims tape file is the basic computer record for the annual statistical run. The court ruled that the prosecution had sustained its burden of showing that the information supplied by the computer is trustworthy. Counsel for the defendants at this point stated that the objection was to the tabulations or summary of evidence, stating that sufficient ground work had not been laid to permit the introduction of summaries rather than original records. The prosecuting attorney then stated that the vouchers from which the tabulations for the doctors' profiles had been made were then in court along with the doctors' profiles and the annual statistical run for the year 1967 and that they had been available for checking by counsel for the defendants.

The witness Smith was then permitted to testify from the doctors' profiles, stating the number of payments which each defendant received in the year 1967 for each of five separate procedures. This was all admitted over the objection of both defendants. The prosecution then sought to show the total number of claims paid by Blue Shield in 1967 to all the doctors in Michigan, including the defendants, for each of these five procedures. Both defendants objected on numerous grounds, including the claim that no proof of the number of doctors involved in the survey had been made, that the annual statistical run included many doctors who would never have performed the particular procedures involved in the prosecution because of specialties outside of the area of treatment and the fact that the annual statistical

record is a summary based on primary records which were never made available to the defendants.

Out of the presence of the jury the witness Smith again explained how the paid claims tape file is constructed and stored and how information from it is retrieved by the computer. He testified that the paid claims tape file is the best and most accurate record for accounting purposes maintained by the Michigan Blue Shield and that the annual statistical report is based entirely on the paid claims file. He again described how the annual statistical report is balanced to insure its accuracy, and the reliance which the company places on it. The witness stated that the sources of the information contained in the annual statistical report were still available in the form of magnetic tapes and that these tapes are computerized reflections of the original entries in the form of check vouchers. Copies of the check vouchers are maintained along with microfilm copies of the DSR's filed by the various doctors in Michigan. These are the original documents which generate the payments by check with vouchers at-

tached which make up the paid claims file. The annual statistical record for the year 1967 was produced on November 7 and 8, 1968. Following this testimony, the court admitted the 1967 annual statistical record as an original and primary record made and kept in the regular and every day course of business and relied upon by Blue Shield of Michigan. The court ruled that all the objections of the defendants to the annual statistical record went to the weight of this evidence and not to its admissibility.

The jury then returned and the witness Smith introduced the annual statistical run for the year 1967 as an exhibit and described it to the jury. Testifying from this record, Mr. Smith stated the total number of claims paid in the year 1967 by Michigan Blue Shield to all doctors submitting claims for the five medical procedures previously identified as being involved in this prosecution and stated that these totals included claims of the two defendants. This evidence, together with that contained in the 1967 profiles previously introduced, may be tabulated as follows:

| Procedure Code Number & Description | Dr. Russo | Dr. Lieberwitz | All Doctors |
|---|---|---|---|
| 1046—Initial Arthrocentesis | 2,048 | 817 | 23,897 |
| 1047—Subsequent Arthrocentesis | 553 | 1,749 | 10,693 |
| 1413 Initial Aspiration of Bursa | 3,528 | 613 | 14,357 |
| 1418—Subsequent Aspiration of Bursa | 10,079 | 4,062 | 17,747 |
| 0145—Aspiration of Hematoma | 150 | 613 | 1,568 |

Lengthy cross-examination of Smith failed to produce any evidence which reflected on the trustworthiness of the information contained in the annual statistical report.

Other witnesses called by the prosecution were an employee and a former employee of Dr. Russo who described office procedures in handling the DSR's and subsequent steps taken in processing them for submission to Michigan Blue Shield for payment. One employee testified that she had ink stamps made for a

number of the procedures including arthrocentesis and aspiration of bursa which came up quite often, as this saved time that would have been required to write out the descriptions of these procedures. She testified that the DSR's were brought to her home by Dr. Russo in batches of approximately 1,000. Another witness for the prosecution was Dr. Richard Thompson, an osteopathic physician who was also team physician for the Detroit Lions. He stated that he conducted a full office and hospital

practice in addition to his work with the professional football team and some 20 high schools in the Detroit area. This witness described the medical procedures involved in arthrocentesis, aspiration of bursa, aspiration of hematoma and the preparation required for each of these procedures. He stated that in aspiration of a bursa or hematoma the purpose is to extract fluid and that often two needles are used, one to inject an anesthetic and another larger bored needle to withdraw the fluid. He described the time involved in preparing a patient for these procedures and the various locations where penetration is usually made. He testified that normally an injection of penicillin takes place farther down the arm than an arthrocentesis or aspiration of a shoulder. He said that arthrocentesis involves an actual puncturing of a joint with a needle and this requires insertion directly into the joint. He also testified that he knew of no causal relationship between the common cold and a condition requiring arthrocentesis or an aspiration. It was his testimony that it would be impossible to perform an arthrocentesis of a shoulder joint by inserting a needle in the fleshy or muscular part of the arm. Dr. Thompson testified that in an active practice he and his associate did not have occasion to perform more than 1,000 procedures involving arthrocentesis and aspiration of bursa and hematoma within a period of one year.

Both defendants testified and denied that they had ever discussed the matter of billing Blue Shield for compensable procedures when non-compensable services were performed or that either had ever done this. They stated that every DSR submitted by them correctly reflected the services they had performed. Eight counts of the indictment were dismissed on motion of the prosecution, without objection. The jury found Dr. Russo guilty on all counts in which he was named as the party causing the mailing.

Numerous assignments of error have been made. We will consider several of them separately.

## I. Misjoinder

Appellant contends that there was a misjoinder of defendants under Rule 8(b).[1] It is claimed that the misjoinder was prejudicial, and that even if prejudice is not shown, he is entitled to a reversal. On its face the indictment clearly follows the language of the rule. The two defendants were "alleged to have participated . . . in the same series of acts or transactions constituting . . . offenses." They were charged together in paragraph I of each count and separately in paragraph II of each.

 The fact that no conspiracy was charged does not indicate that there was a misjoinder. United States v. Scott, 413 F.2d 932 (7th Cir. 1969), cert. denied, 396 U.S. 1006, 90 S.Ct. 560, 24 L.Ed.2d 498 (1970). The appellant argues that the jury's finding of each defendant guilty on separate counts coupled with its finding of no joint guilt on any count is proof of misjoinder. As was held in Cacy v. United States, 298 F.2d 227 (9th Cir. 1961), the jury verdict should not be so narrowly construed. Because of the way in which the indictment was presented, a finding of guilt under any count necessarily involved a finding that the fraudulent scheme existed as well as that the particular acts recited in paragraph II thereof occurred.

Paragraph I of each count of the indictment clearly charges that the defendants devised a scheme to defraud Blue Shield of Michigan. It does not

---

1. Rule 8(b) Fed.R.Crim.P. provides:

 *(b) Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

charge that each devised a separate scheme, but that the two of them devised a single scheme. A series of acts, some involving one defendant and some, the other, is then charged in furtherance of the single scheme or artifice. In cases cited by appellant, the indictments were drawn in a significantly different manner. In Chubet v. United States, 414 F.2d 1018 (8th Cir. 1969), one defendant was named in six counts and the other defendant was named in two of the six, but not in the other four counts. There was no allegation linking Chubet with the transactions covered by the other four counts, or that the transactions were connected in any way. It was held that there had been a misjoinder as to Chubet. In Metheany v. United States, 365 F.2d 90 (9th Cir. 1966), a misjoinder was declared where two persons were jointly indicted for separate, but similar acts and there was no allegation or showing that the defendants were engaged in the same series of acts. In King v. United States, 355 F.2d 700 (1st Cir. 1966), two separate indictments were tried together under Rule 13, Fed.R.Crim.P. and this was held to be a misjoinder, since the only connection between them was that they were "substantially the same kinds of transactions." 355 F.2d at 702, n.2. Though both the *Chubet* and *King* opinions discuss Rule 8(b) and the various factors which favor and mitigate against joinder of defendants, in both cases there was ‚a pretrial motion for severance which was denied.

Rule 14, Fed.R.Crim.P.,[2] provides for relief from prejudicial joinder. Among his pretrial motions the appellant included one to enter an order:

> Granting the defendant, Joseph Russo, a separate trial if the government proposes to offer in evidence an alleged statement or confession of Dr. Donald Lieberwitz, if any.

The prosecution responded that neither defendant had made any inculpatory statements to agents or officers of the United States and that a memorandum of an interview with Dr. Lieberwitz would be submitted to counsel for both defendants. The record indicates that this was done some five months before the trial began. On the first day of the eight-week-long trial Judge Thornton, at the request of Dr. Lieberwitz, told the jury that evidence offered in relation to Dr. Russo would not be binding on his co-defendant. Following this copies of DSR's submitted by Dr. Russo were admitted into evidence over objections of the co-defendant that he was not connected with these records. Although similar objections were made throughout the trial, no unqualified motion for a severance was ever made.

■ It was held in Cupo v. United States, 123 U.S.App.D.C. 324, 359 F.2d 990 (1966), cert. denied, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967), that failure to request a severance is a waiver of any rights under Rule 8. The only attempt to obtain separate trials in the district court was Russo's motion for such an order *if* the prosecution intended to use a confession or statement of his co-defendant. Since no motion was made on the basis of a misjoinder under Rule 8(b), the issue cannot be raised for the first time on appeal. United States v. Del Purgatorio, 411 F.2d 84 (2d Cir. 1969).

Appellant insists that, even though he did not clearly and unequivocally move for severance, there was no proof "of existence of a common plan" and therefore the indictment constituted a preju-

---

2. *Rule 14. Relief from Prejudicial Joinder*
If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.
As amended Feb. 28, 1966, eff. July 1, 1966.

dicial misjoinder. The Supreme Court has held that the trial judge has a continuing duty to grant a severance if it appears that a joint trial is producing prejudice to either defendant. Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960). In that case, however, the only threat which connected the defendants was a conspiracy charge which was dismissed at the close of the Government's case. Yet the Court held it was not prejudicial as a matter of law to permit the joint trial to continue though only separate acts of the defendants remained for submission to the jury.

Both defendants emphatically denied that a common scheme existed and there was no direct evidence of its existence. The record abounds, however, with circumstantial evidence of a joint scheme. The defendants conducted their medical practice in shared quarters, with Lieberwitz paying 50% of his gross receipts to Russo. Furthermore, ten of the twelve patient witnesses who testified stated that they had been treated by both doctors. Each of them identified DSR's submitted by both doctors for medical procedures which they testified were not performed. For example, one patient witness said he went to the clinic only for colds, never for problems with his limbs or joints and that he received no shots in the right arm or hip. Yet the prosecution introduced eight DSR's billed by Dr. Russo to Blue Shield in which it was claimed that this patient received treatment consisting of one arthrocentesis of the left hip, one aspiration of the bursa of the left hip, four arthrocenteses of the right shoulder and two aspirations of the bursa of the right shoulder. Also introduced were nine DSR's submitted by Dr. Lieberwitz claiming payment for nine separate procedures of arthrocentesis of the right shoulder on this same patient. This pattern of both doctors billing Blue Shield for the same medical procedures on individual patients which the patient's testimony indicated were not performed was repeated for ten of the twelve patient witnesses. It was not plain error for the district court to fail to grant a severance to Dr. Russo in view of this evidence. Fed.R.Crim.P. 52(b). The pattern of similarity is too strong to require its acceptance as resulting from mere coincidence. There was no prejudicial misjoinder of defendants.

## II. The Computerized Statistical Evidence

Appellant has mounted a broad attack on the admission by the court of the 1967 annual statistical run of Blue Shield of Michigan. In the first place it is claimed that this evidence does not qualify as a business record under 28 U.S.C. § 1732(a), the Federal Business Records Act. That statute establishes the admissibility in federal courts of any writing or record, made as a memorandum or record of an act or transaction, as evidence of such act or transaction if made in the ordinary course of business. This is an exception to the hearsay rule. The uncontradicted testimony of two witnesses established that the 1967 statistical run was a regularly maintained business record of Blue Shield and was made in the ordinary course of business. It was also shown that this record was relied upon by the company in conducting its business, particularly with reference to its auditing and actuarial procedures. The appellant maintains that the annual statistical run is not the record of any act or transaction and that only the original DSR's should have been admitted to prove the "act" of payment for medical procedures.

Computer printouts are not mentioned in the Federal Business Records Act. However, no court could fail to notice the extent to which businesses today depend on computers for a myriad of functions. Perhaps the greatest utility of a computer in the business world is its ability to store large quantities of information which may be quickly retrieved on a selective basis. Assuming that properly functioning com-

puter equipment is used, once the reliability and trustworthiness of the information put into the computer has been established, the computer printouts should be received as evidence of the transactions covered by the input. No evidence was introduced which put in question the mechanical or electronic capabilities of the equipment and the reliability of its output was verified. The procedures for testing the accuracy and reliability of the information fed into the computer were detailed at great length by the witnesses. The district court correctly held that the trustworthiness of the information contained in the computer printout had been established.

■■■■ The appellant also maintains that the computer printout should not have been received in evidence because it was not prepared at the time the acts which it purports to describe were performed or within a reasonable time thereafter as required by 28 U.S.C. § 1732(a). However, the evidence clearly shows that a record of payment was made at the time each DSR was paid by Michigan Blue Shield and that this record was referred to as the paid claims file. This file consisted of reels of magnetic tape which reflected every payment to a doctor in the year 1967. Since the computer printout is just a presentation in structured and comprehensible form of a mass of individual items, it is immaterial that the printout itself was not prepared until 11 months after the close of the year 1967. It would restrict the admissibility of computerized records too severely to hold that the computer product, as well as the input upon which it is based, must be produced at or within a reasonable time after each act or transaction to which it relates.

■■■■ The Federal Business Records Act was adopted for the purpose of facilitating the admission of records into evidence where experience has shown them to be trustworthy. It should be liberally construed to avoid the difficulties of an archaic practice which formerly required every written document to be authenticated by the person who prepared it. Gilbert v. Gulf Oil Corporation, 175 F.2d 705 (4th Cir. 1949); Gradsky v. United States, 342 F.2d 147 (5th Cir. 1965), vacated and remanded on other grounds, 383 U.S. 265, 86 S.Ct. 925, 15 L.Ed.2d 737 (1966). The Act should never be interpreted so strictly as to deprive the courts of the realities of business and professional practices. Harris v. Smith, 372 F.2d 806 (8th Cir. 1967).

■■■■ Appellant insists that the 1967 statistical record was a "summary" which is not admissible, citing Melinder v. United States, 281 F.Supp. 451 (W. D.Okl.1968). That case involved an exhibit prepared by an Internal Revenue agent for use at the trial of an income tax case. It was not a record produced in the ordinary course of business and was merely a recapitulation of certain information which had not been introduced to verify it in the case. The annual statistical run of Blue Shield of Michigan is not a summary, since it contains a record of every claim paid by the organization during a given year. The information contained in it is arranged in a predetermined manner and classified according to medical procedures. However, all paid claims are included and all compensable procedures are covered. It is important to distinguish the entire printout of the 1967 annual statistical run from a separate item of evidence consisting of a summary of portions of the printout. The witness Smith did summarize portions of the annual statistical record and did relate these summaries to the individual doctor's profiles of the defendants. Nevertheless, the entire statistical run was produced by the prosecution as a business record prepared in the ordinary course of business long before the time of the trial. Although summaries may or may not be admissible in evidence according to the circumstances of a particular case, we hold that the computer printout offered in evidence in this case

was an original record and not a mere summary.

The appellant maintains that no proper foundation was laid for the admission of the 1967 annual statistical record. We disagree. The witnesses Smith and Mrachina were qualified as experts by education, training and experience and they showed a familiarity with the use of the particular computers in question. The mechanics of input control to assure accuracy were detailed at great length as was the description of the nature of the information which went into the machine and upon which its printout was based. In United States v. De Georgia, 420 F.2d 889 (9th Cir. 1969), the computerized records of Hertz Corporation were admitted for the purpose of showing that a particular automobile was not involved in any rental or lease activity during a certain period of time. An employee of Hertz was permitted to testify, based on the computer information, that an automobile found in the custody of the defendant at the time of his arrest was stolen from the Hertz lot since it had not been rented or leased. As the opinion points out, the foundation for admission of such evidence consists of showing the input procedures used, the tests for accuracy and reliability and the fact that an established business relies on the computerized records in the ordinary course of carrying on its activities. The defendant then has the opportunity to cross-examine concerning company practices with respect to the input and as to the accuracy of the computer as a memory bank and retriever of information. The concurring opinion in *De Georgia* emphasizes the necessity that the court "be satisfied with all reasonable certainty that both the machine and those who supply its information have performed their functions with utmost accuracy." 420 F.2d at 895. This opinion goes on to say that the trustworthiness of the particular records should be ascertained before they are admitted and that the burden of presenting an adequate foundation for receiving the evidence should be on the parties seeking to introduce it rather than upon the party opposing its introduction. We believe that in this case the prosecution proved the essential elements upon which the district court could, and did, conclude that the annual statistical run of Blue Shield of Michigan was a trustworthy record which was entitled to be received in evidence under the Federal Business Records Act. Two well-reasoned state court opinions support this conclusion. See Transport Indemnity Company v. Seib, 178 Neb. 253, 132 N.W.2d 871 (1965); King v. State ex rel. Murdock Acceptance Corporation, 222 So.2d 393 (Miss.1969).

Appellant also complains that he was not given an opportunity to prepare his defense to the computerized material used by the prosecution. In United States v. Stifel, 433 F.2d 431 (6th Cir. 1970), cert. denied, 401 U.S. 994, 91 S. Ct. 1232, 28 L.Ed.2d 531 (1971), this Court held that if the Government uses highly sophisticated scientific evidence (in that case, neutron activation analysis) involving time consuming and expensive laboratory tests, it must allow time for a defendant to make similar tests. The Manual for Complex and Multidistrict Litigation deals at some length with the use of computer evidence. Its admissibility is strongly defended where the records have been kept in the regular course of business and its reliability has been demonstrated. The Manual further states,

> It is essential that the underlying data used in the analyses, programs and programming method and all relevant computer inputs and outputs be made available to the opposing party far in advance of trial. This procedure is required in the interest of fairness and should facilitate the introduction of admissible computer evidence. Such prodecure provides the adverse party and the court with an opportunity to test and examine the inputs, the program and all outputs prior to trial. (p. 88).

On March 22, 1971 appellant filed a request for particulars in which he

sought information about the evidence which would be used in support of the charges against him. On April 27, 1971 the government filed its response and forwarded to the attorneys for appellant a number of documents relating to the request for particulars. At the same time the Assistant U. S. Attorney forwarded to the attorneys for the appellant certain documents, including—"[A] statistical summary for 1967 compiled from the records of Blue Shield of Michigan. It compares the number of claims filed for certain services by the defendants as against the total number filed by all doctors in the State of Michigan." So far as the record shows, no discovery steps were taken by the appellant between the time of the disclosure by the prosecution of the nature of this particular evidence and the beginning of the trial on September 14, 1971 despite the fact that Rule 16(b) Fed.R.Crim.P. provides for discovery and inspection by a defendant in a criminal case. At the trial Charles Smith's testimony compared the number of claims made by Drs. Russo and Lieberwitz for five particular medical procedures with those made by all of the doctors in Michigan. This summary was prepared by the witness from two sources. The number of claims paid to Drs. Russo and Lieberwitz was determined from the individual doctor's profiles prepared for each one of the defendants concerning which there is no contention on appeal. The information as to the total number of claims paid all doctors in Michigan in the five categories of medical procedures was based on the annual statistical run which was offered and accepted in evidence. In view of the enclosure of the identical summary in the letter of April 27, there was no surprise or sudden, unexpected production of this evidence. Mr. Smith was cross-examined vigorously as to the manner in which the annual statistical run was produced.

Furthermore, on the third day of the trial, September 16, 1971, there was a discussion between the court and counsel concerning exhibits. The prosecuting attorney referred to the fact that he had furnished statistics to counsel for the defendant pursuant to the court's pretrial order and stated that statistics showing the volume of claims in certain categories by the defendants would be compared with the total volume of such claims paid to all doctors throughout Michigan. On September 24, 1971 the witness Smith was recalled for the purpose of testifying about individual doctor's profiles and the annual statistical run of his employer. The court recalled to the attorneys that there had been a previous discussion of this offer of proof and that he had requested attorneys to be prepared to offer authority for their positions. When counsel for appellant complained that the information included in the annual statistical run was exclusively in the control of Blue Shield the court reminded him that he had a right to get an order which would have permitted him to go into the plant and study the whole process, and had not done so. The court ruled that the summary evidence offered by the witness Smith could be introduced because the primary evidence upon which the summary was based was in the courtroom and available for inspection and use in cross-examination by appellant. The prosecuting attorney pointed out again that the original of the computer run for the 1967 annual statistical report was available to counsel for the defendants, that the doctors' profiles and the vouchers from which they were constructed were also available for examination by counsel.

In cross-examining the witness Smith on September 28, 1971 the defense for the first time asked about other information that Blue Shield might furnish from its computer for comparison with the statistics included in his testimony. At no time prior to the trial or after the September 14th conference with the court did the defense make any effort to require the prosecution or Blue Shield to make its computers available to the defendants or to an expert employed by them or even to provide other informa-

tion from the computers which was not then available. The computerized annual statistical run was not introduced into evidence and presented to the jury until September 30, 1971. Defense counsel were given an opportunity to examine the exhibit and to cross-examine both Mr. Smith and Mr. Mrachina extensively concerning it. The prosecuting attorney stated that the reason for introducing the annual statistical run as an exhibit was to provide a foundation for the testimony of Mr. Smith. The court pointed out that the annual statistical run itself was not a summary but a primary and original record constantly used by the company and was admissible in support of the testimony relating to portions of the exhibit by the person under whose supervision it was prepared.

■ In United States v. Kelly, 420 F.2d 26 (2d Cir. 1969), despite a motion for discovery of scientific tests which would be relied upon, the Government failed to inform the defendant of a neutron activation test which it had performed and the defendant only became aware of it at the trial when the Government sought to introduce its exhibits. The defendant objected and requested a month's continuance in the trial to carry out its own neutron tests. The court held that fairness requires a disclosure, in advance, of the results of a scientific test in order to give the defendant an opportunity to conduct his own tests. The present case differs from *Kelly* in several respects. In the first place, in that case there was a motion for discovery as to scientific tests and secondly, there was a motion for a continuance to permit the defendants to conduct their own tests. Neither of these steps was taken by appellant. We conclude, as did the trial judge, that appellant had ample notice of the nature of the statistical evidence which the prosecution planned to use and chose to attempt to discredit this evidence by means of cross-examination rather than availing himself of discovery and the use of expert witnesses of his own choosing. It was within the discretion of the trial judge to admit

the expert testimony of the witness Smith and to permit the introduction of supporting evidence in the form of the annual statistical run after proper foundation had been laid by Smith and the witness Mrachina. Much of the objection to admission of the computerized statistics was held by the trial judge to go to the weight of the evidence rather than its admissibility. This ruling was correct in view of the language contained in 28 U.S.C. § 1732(a)—

All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

■ Appellant also complains that the computerized information did not bear directly on the question of guilt or innocence and encouraged the jury to draw unwarranted inferences. The trial court ruled, and we agree, that the testimony of Smith supported by the computerized statistics, when considered in connection with the testimony of Dr. Thompson, furnished an inference from which the jury could properly conclude that the defendants did not actually perform the extremely large numbers of certain designated medical procedures for which they were paid in the year 1967. It is also contended that the court failed to give a qualifying instruction with respect to the statistical evidence. The record discloses that the court instructed the jury that the summaries prepared by the witness Smith and admitted in evidence were not in and of themselves evidence or proof of any facts and were used only as a matter of convenience. The court further instructed that "If and to the extent that you find they are not in truth summaries of facts or figures shown by the evidence in the case, you may disregard them entirely." The court also gave a comprehensive instruction on the right to draw reasonable inferences from established facts and charged that inference might not be built upon inference.

We believe that the instructions, read as a whole, fairly and adequately charged the jury on all of the issues in the case. Kowalchuk v. United States, 176 F.2d 873 (6th Cir. 1949).

### III. Other Issues

Appellant claims error in the ruling of the trial court that the crime charged to Russo and his co-defendant was similar to a conspiracy. As has been pointed out, early in the trial, the court advised the jury that evidence which was connected with only one of the defendants could not be considered against the other. Furthermore, the instructions to the jury contained the following charge:

> It is your duty to give separate personal considerations to the case of each individual defendant. When you do so, you should analyze what the evidence shows with respect to that particular defendant leaving out of consideration entirely any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case determined from his own acts and statements, and the other evidence in the case which may be applicable to him.

Citations in appellant's brief to holdings that guilt is a personal matter are correct statements of the law. However, the statement, repeated several times in the brief of appellant, that the defendants in this case were not charged with any joint endeavor is incorrect. While no conspiracy was charged, a single scheme to defraud was charged against both. In United States v. Grow, 394 F. 2d 182 (4th Cir.), cert. denied, 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968), it was held that,

> [t]he nature of proof in a scheme to defraud, involving two or more persons, is analogous to the nature of proof in a conspiracy. The acts and declarations of each party to the scheme made in furtherance or execution thereof are admissible against all. 394 F.2d at 203.

■■ Appellant also contends that the court erred in several respects with regard to the jury. We have examined each of these contentions carefully and find no substance in them. Appellant was not entitled to have every subscriber to Blue Shield disqualified for cause, since the answers of the veniremen who were questioned about their membership indicated that it would not prejudice them in any way if taken as members of the jury in this case. It is not an abuse of discretion to refuse a challenge for cause when the court's questioning discloses that the prospective juror is unbiased. Dennis v. United States, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950); United States v. Smith, 393 F. 2d 687 (6th Cir.), cert. denied, 393 U.S. 885, 89 S.Ct. 197, 21 L.Ed.2d 162 (1968).

■ The court did not commit error in permitting the jury to have the indictment during its deliberation since an instruction was given that the indictment is not evidence of guilt and only contains a statement of the charges. Garner v. United States, 244 F.2d 575 (6th Cir.), cert. denied, 355 U.S. 832, 78 S.Ct. 47, 2 L.Ed.2d 44 (1957). The appellant did not object at the time the indictment was handed to the foreman and in fact made the statement that Dr. Russo had no objection to the indictment.

■ Appellant complains that evidence of allegedly fraudulent "work excuses" was erroneously admitted during the trial. There was some evidence that the defendants had filled out work excuses for employees of various companies in the Detroit area without actually conducting examinations to determine the reasons for their absence from work. This evidence was not introduced into the case for the purpose of showing that appellant engaged in some totally unrelated crime or illegal activity. One patient witness who testified for the prosecution, J. C. Rex, stated that he went to Dr. Russo's clinic to obtain a work excuse. Evidence was then introduced

that Blue Shield was billed for a bursa aspiration and an arthrocentesis purportedly performed on this patient on the same date. The witness, J. C. Rex, testified that he received neither of these treatments. Both Dr. Russo and Dr. Lieberwitz then testified that, though they did make out work excuses for their patients, to their knowledge all of the excuses which they had written were legitimate. In rebuttal the prosecution produced one Horace Walker, a former employee of Ford Motor Company who testified to his success in obtaining fraudulent work excuses at the clinic. We regard the evidence concerning work excuses to be admissible as tending to show a common scheme or plan in view of the circumstances under which the matter of work excuses was first broached in this case. United States v. Neal, 344 F.2d 254 (6th Cir. 1965).

We have carefully considered each of the other assignments of error made by the appellant and find all of them to be without merit. Reviewing the evidence in the light most favorable to the government following conviction, United States v. Wages, 458 F.2d 1270 (6th Cir. 1972), we find that all of the essential elements of the mail fraud statute were proven and that the verdict of the jury finding appellant guilty of 28 counts is supported by competent evidence. A number of matters relied upon by appellant were not brought to the attention of the trial court and were raised for the first time on appeal. Ordinarily such matters cannot be considered by an appellate court. United States v. Miriani, 422 F.2d 150 (6th Cir.), cert. denied, 399 U.S. 910, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970). While 52(b) of the Fed.R.Crim.P. permits us to notice plain error, its provision should not be lightly invoked. Gariepy v. United States, 220 F.2d 252 (6th Cir.), cert. denied, 350 U.S. 825, 76 S.Ct. 53, 100 L.Ed. 737 (1955). A consideration of the entire proceedings convinces us that no reversible error was committed in this trial. Therefore the judgment of the district court is affirmed.