**MIDFIRST BANK, SSB, an Oklahoma Savings and Loan Association, as Agent for the Government National Mortgage Association, Plaintiff,**

v.

**C.W. HAYNES & COMPANY, INC. a South Carolina Corporation; and First Citizens Bank & Trust Company of South Carolina, a South Carolina Corporation, Defendants.**

Civ. A. No. 3:93–1862–17.

United States District Court,
D. South Carolina,
Columbia Division.

Oct. 3, 1994.

**1308**

William H. Hensel, Richardson, Plowden, Grier & Howser, Columbia, SC, Richard B. Noulles, Gable & Gotwals, Tulsa, OK, for plaintiff.

Michael W. Tighe, Louis H. Lang, Callison, Tighe, Robinson & Anastasion, Columbia, SC, Dominic Sokolsky, Tulsa, OK, for defendants.

## ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

This action involves a dispute regarding the ownership of, and right to proceeds payable under, seventeen mortgage notes originally executed in favor of defendant C.W. Haynes & Company, Inc. ("Haynes") as mortgagee. The mortgage notes were secured by mortgages on the mortgagors' residences, all of which are located in South Carolina. Haynes sold the mortgage notes to Inland Mortgage Company ("Inland") who thereafter placed the mortgage notes in a "pool" of mortgage loans backing a security to be issued by Inland and guaranteed by the Government National Mortgage Association ("GNMA") under its mortgage backed securities program.

This action was initiated in the United States District Court for the northern District of Oklahoma and then transferred to this district where it was initially assigned to the Honorable Dennis Shedd. The case was thereafter transferred to the undersigned District Judge for a resolution of the cross motions for summary judgment that had been filed. The motions were extensively briefed by both sides and the court heard two and one-half hours of oral argument on September 17, 1994.

For the reasons discussed below, the plaintiff's motion for summary judgment is granted, and the defendants' motion for summary judgment is denied.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to

be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, here the plaintiff, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### FACTS

The essential facts in this case are uncontroverted. Prior to October, 1990, Haynes originated the 17 mortgage loans at issue in this case. Pursuant to a repurchase agreement, Haynes sold the mortgage notes to First–Citizens Bank & Trust Company of South Carolina ("First Citizens") pending Haynes' resale of them to a permanent investor. No assignment of these mortgages was recorded at this time. In early October Haynes agreed to sell the mortgage loans to Inland through a broker. Haynes then retrieved the original mortgage notes from First–Citizens, indorsed them, and sent them to Inland. Haynes also sent Inland copies of the assignment of each mortgage dated October 15, 1990 and stamped: "Certified True Copy of Original to be Filed for Recording Upon Funding."

Without paying Haynes for the mortgage loans, on October 25, 1990, Inland placed the mortgage loans in a pool of mortgages to obtain a Government National Mortgage Association ("GNMA") mortgage-backed security. On that same day, Inland sent the mortgage documents (indorsed in blank) to Bank of America, the document custodian, who then examined the documents and certified

to GNMA that they complied with GNMA regulations. Included in the documents was an executed original Form HUD–11711B signed by an Inland officer certifying to GNMA that:

> No mortgage in the referenced pool or loan package is now subject to any security agreement between the issuer and any creditor, and upon the release (delivery) of securities backed by the pool or loan package, only GNMA will have any ownership interest, other than nominal title, in and to the pooled mortgages.

The Custodial Agreement between Inland and Bank of America provided that Bank of America was to hold the mortgage notes on behalf of GNMA.

Inland and GNMA entered into a Guaranty Agreement which specified that it became effective on November 1, 1990, the "issue date" for the security. Pursuant to the Guaranty Agreement, Inland transferred and assigned to GNMA all of its right, title, and interest in and to the mortgages backing the security, effective on the date of the delivery of the GNMA guaranteed security. In return, GNMA guaranteed the timely payment of the principal and interest set forth in the security to be issued under the Guaranty Agreement.

On October 26, 1990, Chemical Bank (GNMA's agent for approving the issuance of GNMA guaranteed securities) received a list of the loans pooled, Inland's certification, Bank of America's certification, and the required forms. After approving issuance of the security, Chemical Bank prepared the security documents and released it to the Participants Trust Company (recipient of all book-entry GNMA securities) on November 9, 1990.

In late October, Gary Shepard, an employee at HUD's Tulsa, Oklahoma office, met with Gary Wilhite and Candy Cody, Inland employees. Wilhite and Cody told Shepard that they had been asked to certify false mortgagor payment histories on two or three loans submitted by Inland to HUD for FHA insurance. Shepard relayed this information to Steve Kottman with HUD's FHA Monitoring Division. Kottman scheduled an on-site

Monitoring Division review of Inland for November 13–16, 1990. On November 13 or 14, 1990, Kottman learned that Inland was placing mortgage loans in GNMA pools without having paid for them. Consequently, on October 16, 1990, GNMA declared Inland in default.[1]

On December 27, 1990, GNMA directed Bank of America to turn over to GNMA all documents held by Bank of America under its custodial agreement with Inland. GNMA delivered these documents to Mid–First which services mortgage pools of defaulted GNMA issuers. GNMA assigned the mortgage loans to Mid–First for the purposes of collecting, receiving, and enforcing the mortgage loans for the benefit of GNMA.

Pursuant to the Guaranty Agreement, GNMA has made full and timely payment of all principal and interest payments due to the purchasers of the GNMA guaranteed security issued by Inland.

Haynes and First–Citizens obtained a judgment against Inland for $1,045,632.19 of which they have received $50,000. Mid–First commenced this suit claiming that it owns the mortgages and the proceeds payable thereunder. Haynes and Mid–First counterclaimed, asserting that they own the mortgages.

## DISCUSSION

### I. BUSINESS RECORDS EXCEPTION

■ As will be seen, the date on which the security was delivered by GNMA is of significance in determining whether GNMA qualifies as a holder in due course of the mortgage notes. For this reason, before the court may properly address the substantive legal issues presented, it is necessary to decide a threshold evidentiary issue. Haynes argues that the records of Participants Trust Company ("PTC") (which establish the actual delivery date of the security as November 9, 1990), are inadmissible hearsay. Haynes asserts that the records of PTC are replications of information sent to it by Chemical Bank.

Federal Rule of Evidence 803(6) provides an exception to the hearsay rule for the following:

> A ... record, or data compilation, in any form, of acts, events ... made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the ... record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Chemical Bank and PTC have a contractual arrangement whereby Chemical Bank provides PTC with the data shown on the transaction journal which is input for PTC by Chemical Bank's employees. Mr. Celifarco with PTC testified that PTC's computer records were based entirely on the records of Chemical Bank and that he did not know how Chemical Bank's computer records were produced. Mr. Celifarco's deposition reveals that PTC relies on the data in the ordinary course of its business, that the record was made at or near the time of the transaction, that the record was transmitted by a person with knowledge, and that it is the regular practice of PTC to make these records.

■ Mid–First argues that the transaction journal meets the requirements of Rule 803(6) regardless of whether it was prepared by a PTC employee or a Chemical Bank employee. Business records of an entity are admissible even though another entity made the records, and the rule does not require an employee of the entity that prepared the record to lay the foundation. *United States v. Childs,* 5 F.3d 1328, 1333 (9th Cir.1993) ("Exhibits can be admitted as business records of an entity, even when that entity was not the maker of those records, so long as the other requirements of Rule 803(6) are met and the circumstances indicate the records are trustworthy."), *cert. denied,* —— U.S. ——, 114 S.Ct. 1385, 128 L.Ed.2d 60

---

1. After learning that the mortgage loans had been placed in a GNMA pool and that GNMA had declared Inland in default, Haynes and First–Citizens recorded the mortgage assignments previously executed in favor of First–Citizens.

(1994); *United States v. Jakobetz*, 955 F.2d 786, 801 (2d Cir.1992) ("Even if the document is originally created by another entity, its creator need not testify when the document has been incorporated into the business records of the testifying entity."); *Saks Int'l, Inc. v. M/V "Export Champion"*, 817 F.2d 1011, 1013–14 (2d Cir.1987) ("Documents may properly be admitted under this Rule as business records even though they are the records of a business entity other than one of the parties, and even though the foundation for their receipt is laid by a witness who is not an employee of the entity that owns and prepared them." (citations omitted)); *Mississippi River Grain Elevator, Inc. v. Bartlett & Co.*, 659 F.2d 1314, 1319 (5th Cir.1981) (Rule 803(6) does not require the documents be prepared by the testifying business. (citing *United States v. Veytia–Bravo*, 603 F.2d 1187, 1191–92 (5th Cir.1979), *cert. denied*, 444 U.S. 1024, 100 S.Ct. 686, 62 L.Ed.2d 658 (1980))).

 Moreover, Rule 803(6) does not require the testifying witness to have personally participated in the creation of the document or to know who actually recorded the information. *United States v. Keplinger*, 776 F.2d 678, 693 (7th Cir.1985). "Obviously, such a requirement would eviscerate the business records exception, since no document could be admitted unless the preparer (and possibly others involved in the information-gathering process) personally testified as to its creation." *Keplinger*, 776 F.2d at 694. Rather, the business records exception requires the witness to be familiar with the record keeping system. *Id.; see also United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir.1986). The phrase "other qualified witness" should be broadly interpreted. 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE ¶ 803(6)[2], at 803–196 to –198 (1994).

 Haynes further argues that computer records require additional foundation for admission such as evidence regarding the original source of the computer program used to produce the records and procedures for input control. In support of its position, Haynes cites *United States v. Russo*, 480 F.2d 1228 (6th Cir.1973) and *United States v. Scholle*,

553 F.2d 1109 (8th Cir.1977). Haynes' reliance on these cases is misplaced. In *Russo* the court recognized that the business records exception should be liberally construed to avoid the former archaic practice of requiring authentication by the preparer of the record. *Russo*, 480 F.2d at 1240. In discussing computer printouts, the court noted that modern businesses rely largely upon computers to store large quantities of information, and such information is admissible so long as it is trustworthy and reliable. *Id.* at 1239–40. The only portion of *Russo* which discusses a need for programming data involves scientific computer evidence on neutron activation analysis used to prosecute the defendant. Clearly, scientific computer evidence used in a criminal case is distinguishable from the transaction journal at issue here. The transaction journal cannot be said to require the degree of scrutiny that scientific evidence requires. Furthermore, Haynes does not even challenge the reliability and trustworthiness of the transaction journal. In *Scholle*, also a criminal case, the court did require a more comprehensive foundation for computer data which analyzed drug trafficking throughout the country in an effort to detect possible drug conspiracies. *Scholle*, 553 F.2d at 1123–25. Again, these records are distinguishable from the transaction journal in the present case.

 The Bankruptcy Court for the Eastern District of Virginia noted that "[d]ecisions are legion admitting computer records as Rule 803(6) business records." *Central Fidelity Bank v. Denslow (In re Denslow)*, 104 B.R. 761, 764 (Bankr.E.D.Va.1989) (footnote omitted). Computer records are admissible so long as the requirements of Rule 803(6) are met, and no more is required. *See, e.g., id.* at 764–65.

 Given the foregoing authority, this court finds the transaction journal admissible under the business records exception. Consequently, the November 9, 1990 delivery date of the security is not disputed because the transaction journal clearly establishes this date.

## II. RECORDING STATUTES

■ Haynes[2] argues that the South Carolina Recording Statutes, S.C.CODE ANN. §§ 30–7–10 to –60 (Law.Co-op.1991), control the disposition of this case because the very essence of GNMA's Mortgage–Backed Securities ("MBS") Program involves the sale of mortgages; and therefore, the law of mortgages applies. However, Mid–First correctly refutes Haynes' contention by pointing out that the mortgage notes indorsed and delivered by Haynes to Inland and then negotiated by Inland to GNMA were negotiable instruments. Article Three of the Uniform Commercial Code governs the transfer of negotiable instruments. Additionally, the recording statutes are designed to protect "subsequent purchasers" *Prudential Ins. Co. of America v. Wadford,* 232 S.C. 476, 480, 102 S.E.2d 889, 891–92 (1958), and to deal with the problems created by a "double conveyance" *Epps v. McCallum Realty Co.,* 139 S.C. 481, 497–98, 138 S.E. 297, 302 (1927). Haynes and First–Citizens do not qualify as either. Consequently, this court finds the recording statutes inapplicable.

## III. UNIFORM COMMERCIAL CODE

Both parties agree that if the Uniform Commercial Code ("UCC") applies in this case, then South Carolina's version controls.[3]

Haynes argues that UCC Article Three should not apply in this case because the rationale underlying the good faith purchaser for value concept (embodied in Article Three as holder in due course) no longer applies in modern day transactions. Haynes contends that this protection is unnecessary in modern day transactions because a merchant can "require the strictest accounting from the person from whom he is receiving the instrument." (Haynes Memorandum at 24.) However, Article Three of the UCC controls transfers of negotiable instruments, and the mortgage notes are clearly negotiable. If UCC Article Three should not apply in this case and the holder in due course doctrine is no longer warranted, then any abolishment of

that body of law should come from the legislature, not the court.

Haynes next argues that the transfer of the mortgage loans between Inland and GNMA is more akin to a secured transaction (GNMA guaranteed security is issued in return for the mortgage pool which serves as a type of collateral); and therefore, Article Nine should apply over Article Three. Haynes then recognizes that because Article Nine does not apply to "the creation or transfer of an interest in or lien on real estate," S.C.CODE ANN. § 36–9–104(j) (Law. Co-op.Supp.1993), then the recording statutes should apply. Comment 4 to § 36–9–102(3) illustrates the application of Article Nine as follows:

> The owner of Blackacre borrows $10,000 from his neighbor, and secures his note by a mortgage on Blackacre. This article is not applicable to the creation of the real estate mortgage. Nor is it applicable to a sale of the note by the mortgagee, even though the mortgage continues to secure the note. However, when the mortgagee pledges the note to secure his own obligation to X, this article applies to the security interest thus created, which is a security interest in an instrument even though the instrument is secured by a real estate mortgage. This article leaves to other law the question of the effect on rights under the mortgage of delivery or nondelivery of the mortgage or of recording or nonrecording of an assignment of the mortgagor's interest. See Section 9–104(1). But under Section 3–304(5) recording of the assignment does not of itself prevent X from holding the note in due course.

Apparently, even if Haynes and First–Citizens had recorded their assignment, the recording alone would not prevent GNMA from becoming a HDC. Mid–First agrees that Article Nine does not govern in this case. The fact that Article Nine is inapplicable does not render the recording statutes any

---

**2.** Throughout this opinion, reference to Haynes' arguments includes First–Citizens.

**3.** Mid–First contends that the court should fashion a uniform federal rule in favor of GNMA, and to that extent Mid–First does dispute the application of South Carolina law. *See infra* Part IV.

more applicable, and it has no bearing on the applicability of Article Three.

## IV. UNIFORM FEDERAL RULE

 Mid–First requests the court to adopt the following uniform federal rule:

Where a negotiable instrument has been endorsed in blank and delivered to a custodian for GNMA under the MBS Program, and GNMA itself does not have actual knowledge of a claim or defense to the instrument, GNMA qualifies as a holder in due course of the instrument upon the issuance and delivery of a security guaranteed by GNMA and backed by the instrument.

The Supreme Court "has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711, 722 (1979). When the statute authorizing the federal program does not resolve the issue, the court must determine whether to adopt state law or to create a nationwide federal rule. *Id.* at 728, 99 S.Ct. at 1458, 59 L.Ed.2d at 723–24. The court should consider the following factors in making its decision: (1) the need for a national uniform body of law; (2) whether applying state law would frustrate objectives of the federal program; and (3) the extent to which a uniform federal rule would disrupt commercial relationships predicated on state law. *Id.* at 728–29, 99 S.Ct. at 1458–59, 59 L.Ed.2d at 724.

Mid–First relies on *Gunter v. Hutcheson*, 674 F.2d 862 (11th Cir.), *cert. denied* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), a prior case in which the court adopted a uniform federal rule in favor of the Federal Deposit Insurance Corporation ("FDIC") that is similar to Mid–First's proposed rule. When the FDIC becomes the receiver of a failed bank, it is required by statute to minimize the cost to the deposit insurance fund and maximize the return to the creditors of the failed bank. The FDIC also operates under severe time constraints when it takes over a failed bank. Because the FDIC must work to the best advantage of the failed bank's creditors in a short period of time, the courts have deemed the FDIC entitled to HDC status when the requirements of the uniform federal rule are satisfied. Unlike the FDIC, no federal statute imposes any obligation on GNMA to protect some third party when an issuer is placed in default. Further, GNMA has no obligation regarding the handling of the mortgage-servicing portfolio of a defaulted issuer. Consequently, the rationale for fashioning a uniform federal rule in favor of the FDIC does not seem to apply to GNMA's MBS Program.

Additionally, the *Kimbell* Court recognized that "state commercial codes 'furnish convenient solutions in no way inconsistent with adequate protection of the federal interest[s],'" and therefore, it declined to "override intricate state laws of general applicability on which private creditors base their daily commercial transactions." *Kimbell Foods, Inc.*, 440 U.S. at 729, 99 S.Ct. at 1459, 59 L.Ed.2d at 725 (quoting *United States v. Standard Oil Co. of Calif.*, 332 U.S. 301, 309, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067, 2072 (1947)). The Court concluded: "Because the ultimate consequences of altering settled commercial practices are so difficult to foresee, we hesitate to create new uncertainties, in the absence of careful legislative deliberation." *Id.* 440 U.S. at 739–40, 99 S.Ct. at 1464, 59 L.Ed.2d at 731.

Based on the foregoing, the court does not find a uniform federal rule in favor of GNMA warranted in this case.

## V. HOLDER IN DUE COURSE

 Mid–First argues that GNMA qualifies as a holder in due course ("HDC") because as such, it would not be subject to Haynes' ownership claims to the mortgage notes and mortgages. A HDC "takes the instrument free from ... all claims to it on the part of any person." S.C.CODE ANN. § 36–3–305(1) (Law.Co-op.1977).

A HDC is a holder who takes the instrument (a) for value; (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim

to it on the part of any person.[4] S.C.CODE ANN. § 36–3–302 (Law.Co-op.1977).

■■■ Haynes argues that GNMA took the mortgage notes merely by assignment and not by negotiation; and therefore, GNMA could not be a HDC. Haynes claims that GNMA steps into Inland's shoes and holds the same rights as Inland. "[T]he general rule is that the title and interests in a negotiable instrument of one acquiring the same *other than by negotiation* are equal to, but not greater than, those of the one from whom he purchases it for value, whether it is assigned, or transferred to him by a delivery without an indorsement." 11 AM.JUR.2D *Bills and Notes* § 373 (1963) (footnotes omitted) (emphasis added). In the present case, Inland not only assigned its right, title, and interest in the mortgages to GNMA, but also negotiated the mortgage notes to GNMA through its indorsement. Consequently, because Inland negotiated the notes to GNMA, GNMA is not prevented from HDC status by the above-quoted language.

Haynes also argues that GNMA took the mortgage notes through either bulk sale or legal process; and therefore, GNMA cannot be a HDC. *See* S.C.CODE ANN. § 36–3–302(3) (Law.Co-op.1977). Haynes contends that when GNMA placed Inland in default, it acquired the mortgage loans by legal process or bulk transfer, not negotiation. Mid–First contends that GNMA became a holder on October 25, 1990, when Inland negotiated the mortgage notes over to GNMA and sent them to Bank of America to hold on behalf of GNMA. Mid–First further contends that GNMA gave value for the mortgage notes on November 9, 1990, when it delivered the GNMA guaranteed security backed by the those mortgage loans; and thus, became a HDC on November 9, 1990. As discussed below, Mid–First's claim that GNMA was a HDC on November 9, 1990, is supported by the applicable law; therefore, GNMA was already a HDC when it acquired the notes after placing Inland in default. When Inland indorsed each mortgage note over to GNMA in blank, the transaction was a negotiation,

not a transfer through bulk sale or legal process.

### 1) Was GNMA a holder of the mortgage notes?

■■■ In determining GNMA's status as a HDC, the first inquiry involves ascertaining whether GNMA was a holder. A holder is a "person who is in possession of . . . an instrument . . . drawn, issued, or indorsed to him or to his order or to bearer or in blank." S.C.CODE ANN. § 36–1–201(20) (Law.Co-op.Supp.1993). Because GNMA never had physical possession of the mortgage notes, the central focus becomes constructive possession. Although no South Carolina cases interpreting "holder" or "possession" as used in this context appear to exist, Mid–First cites authority from other jurisdictions in an effort to persuade the court to apply the concept of constructive possession. These cases generally hold that constructive possession exists when an authorized agent of the owner holds the note on behalf of the owner. *See Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 452 F.Supp. 1108 (S.D.N.Y.1978); *Schranz v. I.L. Grossman, Inc.,* 90 Ill.App.3d 507, 45 Ill.Dec. 654, 412 N.E.2d 1378 (1980); *Billingsley v. Kelly,* 261 Md. 116, 274 A.2d 113 (1971); *Snyder v. Town Hill Motors, Inc.,* 193 Pa.Super. 578, 165 A.2d 293 (1960); *Lazidis v. Goidl,* 564 S.W.2d 453 (Tex.Ct.App. 1978). "[T]he possession required by the Code to constitute a person a 'holder' may be a constructive possession by delivery to one on his behalf. Thus a person is a 'holder' of commercial paper when it is in the physical possession of his agent." 1 RONALD A. ANDERSON, UNIFORM COMMERCIAL CODE § 1–201:106 (3d ed. 1981) (footnotes omitted). In order to find constructive delivery, the transferor must deliver the note "with the unmistakable intention of transferring title to the instrument." *Corporacion Venezolana de Fomento,* 452 F.Supp. at 1117 (citing *Bacal v. National City Bank,* 146 Misc. 732, 262 N.Y.S. 839 (2d Dist.1933); 2 RONALD A.

---

**4.** The only relevant issue arising under (c) involves whether GNMA had notice of Haynes'

claim to the mortgage notes.

ANDERSON, UNIFORM COMMERCIAL CODE § 3–202:38, at 775 (2d ed. 1971)).

Haynes argues that constructive delivery to GNMA never occurred because Inland retained nominal title to the mortgage notes [5] and did not relinquish all power and control over the notes. Mid–First refutes Haynes' position by referring to the Guaranty Agreement entered into by Inland and GNMA, whereby Inland agreed to "transfer, assign, set over, and otherwise convey to GNMA all the right, title, and interest of the Issuer [Inland] in and to the mortgages."

Haynes also argues that Bank of America was a dual agent of GNMA and Inland; and therefore, it could not possess the notes such that one of its principals became a holder to the exclusion of the other. Haynes relies on AMERICAN JURISPRUDENCE which actually allows dual agency unless loyalty to one principal involves breach of a duty to the other. 3 AMJUR.2D *Agency* § 244 (1986).

When Inland indorsed the mortgage notes in blank and delivered them to Bank of America on October 25, 1990, for it to hold on behalf of GNMA, GNMA constructively possessed the notes. Because the court finds the concept of constructive possession applicable, GNMA became a holder on October 25, 1990.

*2) Did GNMA give value for the mortgage notes?*

■ A holder gives value for an instrument "(a) to the extent that the agreed consideration has been performed ... or (c) when he ... makes an irrevocable commitment to a third person." S.C.CODE ANN. § 36–3–303 (Law.Co-op.1977).

Mid–First claims that GNMA gave value on November 9, 1990, when it guaranteed and delivered the security to be issued by Inland and backed by the mortgage loans.[6] Mid–First argues that GNMA's guaranty was an irrevocable commitment as well as its

agreed upon consideration. Haynes cites a North Carolina Court of Appeals case for the proposition that the irrevocable commitment to the third party must be given simultaneously with taking possession of the instrument. *Bennett v. United States Fidelity & Guar. Co.*, 19 N.C.App. 66, 198 S.E.2d 33, *cert. denied*, 284 N.C. 121, 199 S.E.2d 659 (1973).[7] *Bennett* is not wholly on point with this case because in *Bennett* there was no bargained for exchange, and the party claiming to have given value was merely a gratuitous transferee. Consequently, the timing of the commitment was not the court's focus in the case. In the present case, Inland negotiated the mortgage notes to GNMA in return for GNMA's guarantee of the mortgage-backed security; and therefore, a bargained for exchange existed. Additionally, this court recognizes a likely concern with the simultaneous requirement: How exact in time must the simultaneous exchange be?

Under § 36–3–303(a), an executory promise is not value, but to the extent the promise is later performed, it becomes value. *See* 4 WILLIAM D. HAWKLAND & LARY LAWRENCE, UNIFORM COMMERCIAL CODE SERIES § 3–303:02 (1994); 5A RONALD A. ANDERSON, UNIFORM COMMERCIAL CODE § 3–303:25 (3d ed.1994). An exception to the general rule that executory consideration is not value arises when an irrevocable commitment is made to a third person. 4 HAWKLAND & LAWRENCE, *supra*, § 3–303:07. One of the clearest examples of an irrevocable commitment is a guarantee. *Id.* The holder gives value upon making the irrevocable commitment because "the holder is exposed to potential personal liability since his promise runs to a third person against whom he cannot suspend performance once he receives notice of a defense to payment of the instrument." *Id.* When GNMA delivered the GNMA guaranteed security, as promised, it both performed the agreed upon consideration and made an irrevocable commitment

---

**5.** Inland held nominal title to enable it to service the mortgages (i.e., collect payments due under the mortgage notes).

**6.** By its guaranty, GNMA agreed to pay any principal and/or interest due under the security if Inland was unable to make the payments.

**7.** The simultaneous transaction requirement seems to be limited to this case. It has not been found in any other case.

to the purchasers of the security that it would pay if Inland defaulted. Consequently, GNMA gave value on November 9, 1990.

*3) Did GNMA take the mortgage notes in good faith without notice of any claim to them?*

Good faith means "honesty in fact in the conduct or transaction concerned." S.C.CODE ANN. § 36–1–201(19) (Law.Co-op.1977). GNMA states that it followed the same procedures in approving the issuance and guaranty of the security backed by the mortgage notes for Inland as it does in approving and guaranteeing all others. Haynes claims that GNMA violated some of its own policies,[8] and therefore, should be precluded for asserting that it took the notes in good faith without notice. The fact that every policy was not strictly complied with does not seem to bear on GNMA's notice of the claims to the mortgage notes in this case. Even "negligence has no reflection on the good faith requirement of a holder's status as a holder in due course absent such outrageous conduct as would reflect on the issue of honesty." *Third Nat'l Bank v. Handi–Gardens Supply of Ill., Inc.,* 380 F.Supp. 930, 941 (N.D.Tenn.1974) (citing *McConnico v. Third Nat'l Bank,* 499 S.W.2d 874, 881 (Tenn. 1973)). In *Industrial Nat'l Bank of R.I. v. Leo's Used Car Exch., Inc.,* 362 Mass. 797, 291 N.E.2d 603 (1973), the court held that a banks' violation of its own policy of requiring managerial approval before cashing corporate checks drawn on another bank was insufficient to establish lack of good faith.

Therefore, the court finds that GNMA took the mortgage notes in good faith. The next determination entails whether GNMA had notice that Inland was including mortgage loans in pools backing GNMA guaranteed securities without having paid for those loans before it gave value.

"A person has 'notice' of a fact when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists." S.C.CODE ANN. § 36–1–201(25) (Law.Co-op.1977).

The parties do not dispute that GNMA received actual notice of the claims to the mortgage loans on November 13 or 14, 1990. The dispute centers around whether notice to Gary Shepard of HUD in late October of the false payment histories constituted notice to GNMA of claims to the mortgage notes at issue. First, Shepard had no duty to disclose the false payment histories to GNMA because that information concerned FHA insurance and not the MBS Program. Even though both GNMA and the FHA division are both within HUD, the entities operate independently of each other and it seems unrealistic to charge GNMA with an FHA employee's knowledge.

The fact that an employee in one department of a bank has knowledge of the facts does not cause that knowledge to be imputed to another department where there was no evidence that there was a pattern or duty of communicating between the different departments.

1 ANDERSON, *supra,* § 1–201:139; *see also Wyler v. Korean Air Lines Co.,* 928 F.2d 1167, 1171 (D.C.Cir.1991) ("One federal agency 'should not be charged with knowledge of what another is doing simply because both are components of the same federal government.'" (quoting *J.A. Jones Constr. Co. v. United States,* 390 F.2d 886, 891, 182 Ct.Cl. 615 (1968))); *Burke v. United States,* 67 F.Supp. 827, 829–30, 107 Ct.Cl. 106 (1946) (Notice to an army officer in one branch of some fact relating to another branch is not notice to the other branch.). Second, even if GNMA had received notice of the false payment histories, that would not constitute notice of the claims to the wholly unrelated mortgage notes.

The copies of the Assignments of Mortgages from Haynes to Inland contained the following stamp: "Certified True Copy of Original to be Filed for Recording Upon Funding." The parties dispute whether this stamp was sufficient to put GNMA on notice of Haynes' claim. The stamp was dated October 15, 1990, and Mid–First argues that it was reasonable for it to assume that be-

8. Inland did not submit certain financial state- ments as required by GNMA.

tween that date and October 25, 1990, the funds were sent. The Custodial Agreement between Inland and Bank of America required Inland to provide assignments showing a complete chain of title which has either been recorded or has been transmitted for recording. Haynes argues that because no recording information appeared on the face of any of the mortgage assignments, the Bank of America should have noticed the defect and required Inland to correct it. Haynes also asserts that notice of the recording defect to Bank of America is notice to GNMA.

■ Two views have emerged for deciding when a person is deemed to have notice of a claim. The majority of courts apply the inferable knowledge test which imposes no duty on the purchaser to investigate when confronted with suspicious circumstances. 4 HAWKLAND & LAWRENCE, *supra*, § 3–304:05. The purchaser only has reason to know of a claim where, from all known facts, the only reasonable conclusion is that a claim exists. *Id.; see also D.H. Cattle Holdings Co. v. Kuntz*, 165 A.D.2d 568, 568 N.Y.S.2d 229, 230–31 (1991) ("a holder is under no duty to investigate the status of a contract underlying a note even when there exists suspicious circumstances which might induce a prudent banker to do so"). The minority of courts apply the duty to inquire test which requires a purchaser to further investigate when a reasonable person would. 4 HAWKLAND & LAWRENCE, *supra*, § 3–304:05.

The stamp evidenced an executory agreement between Haynes and Inland. However, the language of the stamp alone was insufficient to put GNMA on notice of Haynes' claim.

Knowledge that an instrument was issued or negotiated in return for an executory promise, or accompanied by a separate agreement, does not give a purchaser notice of a claim or defense. Unlike some pre-Code cases, knowledge of an executory promise will not impose upon the purchaser the duty to inquire as to whether the promise has been performed. By issuing an instrument in exchange for an executory promise, or pursuant to a separate agreement which contains an executory

promise, the obligor assumes the risk that a holder in due course will deprive him of his right to raise the defense of failure of consideration or other breach of the promise. The purchaser only has notice of a defense if he has notice that a breach of the promise has already occurred.

*Id.* § 3–304:07 (footnotes omitted).

In *Eldon's Super Fresh Stores, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, the court held that notice under the inferable knowledge test requires more than failure to make inquiry about an unknown fact. 296 Minn. 130, 207 N.W.2d 282, 288 (1973) (citing *Jeanette Frocks, Inc. v. First Produce State Bank*, 272 Minn. 234, 137 N.W.2d 205 (1965)). If an instrument simply makes reference to an executory agreement, that is not sufficient to constitute notice of a claim or defense. *Western Bank v. RaDec Constr. Co.*, 382 N.W.2d 406, 410 (S.D.1986). In order to defeat HDC status, the holder must have had inferable knowledge that a claim or defense had arisen under the executory agreement. *Id.* at 410–11.

This court finds that the inferable knowledge test, followed by the majority of courts, produces the best result under the UCC. "To impose upon one who is offered commercial paper the duty of inquiring in each instance whether obligations have been satisfactorily performed by prior holders would so burden such transactions as to create insuperable impedimenta to the free exchange of negotiable paper, an indispensable part of modern business." *Jaeger & Branch, Inc. v. Pappas*, 20 Utah 2d 100, 433 P.2d 605, 607–08 (1967). In today's fast-paced commercial transactions, the minority view would work a hardship on many businesses that cannot afford the delay created by an investigation into the underlying executory agreement. Consequently, because it was reasonable for GNMA to assume that Inland had sent the funds since the date of the stamp, GNMA was excused from delving any further into the stamp's meaning, and GNMA took the notes without notice of Haynes' claim.

■ Haynes next argues that Inland was GNMA's agent; and therefore, GNMA is charged with Inland's knowledge that

Haynes was still owed money for the mortgage notes. Haynes essentially relies on GNMA's strict requirements with which Inland must comply in order to place mortgages in GNMA's MBS Program. Haynes claims these requirements demonstrate GNMA's control over Inland. However, Inland acts on its own in purchasing the mortgage loans from the originators and GNMA does not establish Inland's policies regarding those transactions. Inland is not acting on behalf of GNMA when it acquires mortgage loans.

■ Finally, Haynes argues that the close-connectedness doctrine precludes GNMA from claiming it took the mortgage notes in good faith without notice. "A transferee does not take an instrument in good faith when the transferee is so closely connected with the transferor that the transferee may be charged with knowledge of an infirmity in the underlying transaction." *Arcanum Nat'l Bank v. Hessler*, 69 Ohio St.2d 549, 23 O.O.3d 468, 471, 433 N.E.2d 204, 209 (1982). The doctrine is intended to allow a consumer/maker of a note to establish a defense based on the payee's nonperformance of the underlying transaction when the payee has negotiated the note to a closely-connected third party (i.e., sister company, subsidiary or parent company). Without the closely-connected doctrine, the third party could assert HDC status and preclude the maker from asserting his defense. JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 14–8 (1972). The court finds the doctrine inapplicable in this case.

## VI. MORTGAGE FOLLOWS THE NOTE

■ The parties dispute whether the mortgages follow the notes in this case. Haynes argues that the it owns the mortgages irrespective of GNMA's ownership of the notes. Mid–First contends that because it owns the notes, it also owns the mortgages securing those notes.

■ South Carolina recognizes the "familiar and uncontroverted proposition" that "the assignment of a note secured by a mortgage carries with it an assignment of the mortgage." *Hahn v. Smith*, 157 S.C. 157, 154 S.E. 112 (1930); *Ballou v. Young*, 42 S.C. 170, 20 S.E. 84 (1894). "The assignment of a mortgage as distinct from the debt it secures is nugatory and confers no rights upon the transferee...." *South Carolina Nat'l Bank v. Halter*, 293 S.C. 121, 128, 359 S.E.2d 74, 77 (Ct.App.1987) (citing *Hahn*, 157 S.C. 157, 154 S.E. 112); *see also* 55 AM. JUR.2D *Mortgages* § 1317 (1971).

The great weight of authority certainly favors applying the rule that the mortgages follow the notes; and therefore, because GNMA owns the mortgage notes, it also owns the mortgages.

## VII. TWO INNOCENT PARTIES

■ Both parties argue that as between two innocent parties, the other should bear the loss. Several South Carolina cases have held that where one of two innocent parties must bear a loss occasioned by the fraud of a third party, the loss should fall upon the party whose active conduct or passive negligence enabled the third party to commit the fraud. *See Hahn*, 157 S.C. 157, 154 S.E. 112; *Bank of Anderson v. Breedin*, 119 S.C. 39, 111 S.E. 799 (1922); *American Fed. Bank, FSB v. Parker*, 301 S.C. 509, 392 S.E.2d 798 (Ct.App.1990).

Mid–First contends that because Haynes put the originally indorsed mortgage notes in the stream of commerce, then it should bear the loss. If Haynes had sent copies of the notes rather than indorsed originals then Inland would not have been able to place the mortgage notes in a GNMA pool until it received the originals. Possibly, Haynes should have delivered the original notes to the broker, and when Inland paid Haynes, the broker could then deliver the original notes.

One significant distinction between the above-cited cases and the present case is that in each of those cases no evidence existed that the party whose conduct enabled the third party to commit the fraud was acting in accordance with standard business practices. The president of Haynes stated in his affidavit that endorsing and sending the original notes to Inland conformed to standard practices in the banking industry.

On the other hand, Haynes argues that Mid–First should bear the loss because

GNMA created the system in which original mortgage notes indorsed in blank are sent to mortgage-backed securities issuers before payment. Haynes also relies on *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 634 A.2d 74 (1993), in which the court found that as between the title insurer and a purchaser of real estate, the title insurer should bear the loss caused by the closing attorney's dishonesty. The court noted that the title insurer by placing its imprimatur on the closing attorney, denominating him as an approved attorney, launched him into the world of real estate closings and title insurance (though the approved attorney did not actually issue the title policy). GNMA's approval of Inland as an issuer of GNMA guaranteed mortgage-backed securities is somewhat analogous to the case above because GNMA denominated Inland an approved issuer, thereby launching Inland into the secondary mortgage market.

No obvious choice exists in determining who should bear the loss between these two innocent parties. If Haynes does not recover the one million dollars it lost, then it quite possibly could incur severe financial troubles. However, if GNMA is forced to bear the loss in this case and then in many others like it in the future, that could certainly impact on the program's effectiveness. The MBS Program is designed in part to put more money back into the pockets of banks and mortgage companies, thereby enabling them to make more home loans. In other words, the increased capital into the mortgage industry enhances the availability of mortgages for use by private citizens to purchase homes. If GNMA is forced to bear the loss occasioned by an issuer's fraud, the amount of money that is circulated back into the mortgage industry may well decrease.

Because this court finds that Article Three of the UCC resolves the dispute over the ownership of the mortgage notes and mortgages at issue, this court declines to place the loss on one of the innocent parties on the basis of active conduct or passive negligence.

## VIII. EFFECT OF PRIOR CONVERSION ACTION

■ Mid–First argues that the judgment rendered previously against Inland in favor of Haynes precludes Haynes from claiming any ownership in the notes or the mortgages.

> [One] effect of a judgment may be to transfer the title of the plaintiff to the defendant, and according to some cases, a mere judgment for the plaintiff, without satisfaction, is sufficient to vest such title in the defendant. Other courts have held that the satisfaction of a judgment for conversion ordinarily transfers the title in the property to the defendant, and the transfer does not occur until satisfaction. In support of the latter position, it has been said that an action for conversion is but a tentative attempt to obtain justice for a wrong, and, until pursued so far that it has given actual satisfaction, ought not to bar the plaintiff from asserting his title. . . .

18 AM.JUR.2D *Conversion* § 180 (1985) (footnotes omitted).

Mid–First relies on *Hawkins v. Collins*, 61 S.C. 537, 39 S.E. 768 (1901), which is not wholly on point because in *Hawkins* the focus of the court's decision surrounded title to the converted property at the time the suit was filed and a release was signed; not at the time of judgment.

Haynes has only received a partial satisfaction ($50,000 of the $1,045,632.19 it is owed); and therefore, the better view would allow Haynes to assert its ownership in the notes and mortgages. South Carolina plaintiffs are entitled to as many judgments as there are defendants liable, but are entitled to but one satisfied judgment. *McKenzie v. Southern Ry. Co.*, 113 S.C. 453, 102 S.E. 514 (1920).

## CONCLUSION

All of the disputes in this case involve legal issues rather than genuine issues of material fact; and therefore, summary judgment in favor of one of the parties is appropriate.

The court finds GNMA a HDC because it became a holder on October 25, 1990, when the mortgage notes were delivered to Bank of America to hold on its behalf. GNMA

then gave value on November 9, 1990, when the guaranteed security was delivered for Inland's issuance. Consequently, on November 13 or 14, 1990, when GNMA received notice that Inland was placing mortgage loans in GNMA pools without having paid for them, GNMA was already a HDC.

For the foregoing reasons, the court determines that Mid–First owns the mortgage notes and mortgages at issue. Summary judgment shall be granted to the Plaintiff.

IT IS SO ORDERED.