**UNITED STATES of America**

v.

**Ioannis KORAKIS**

**No. CR. 1:02CF283.**

United States District Court, E.D. Virginia, Alexandria Division.

July 8, 2004.

---

### *ORDER*

ELLIS, District Judge.

The matter is before the Court on *pro se* defendant's motion to vacate, set aside or

correct sentence, pursuant to 28 U.S.C. § 2255. Both defendant and the government have fully briefed the issues raised in defendant's motion and the matter is now ripe for disposition.[1]

## I.

A brief recitation of the substantive and procedural facts of this case is helpful. The factual record in this case reflects that in or about August of 2001, the United States Drug Enforcement Agency (DEA), using information obtained from an unindicted co-conspirator, began investigating the activities of Darwin Regio and others with respect to Regio's alleged distribution of 3,4 Methylenedioxymethamphetamine (MDMA), commonly known as "ecstasy," in the Eastern District of Virginia. DEA agents were eventually able to infiltrate Regio's drug distribution enterprise through the use of confidential sources, wire taps and surveillance and, in doing so, they learned that Regio had supplied large quantities of MDMA and marijuana to various customers for redistribution in and around the Eastern District of Virginia from November 2000 until April 2002.

In the course of the conspiracy, customers including Ramir Magbanua, James Yerby, John Belardo, Jocar Lopez, Tung Chau and Khoi Nguyen would typically pay Regio for quantities of controlled substances prior to their delivery and then, using this "fronted" money, Regio would obtain the drugs from various sources in Canada. Regio recruited and directed a number of couriers to transport the controlled substances from Canada or elsewhere to Virginia. Among the individuals recruited as couriers were Yanghi Kim, David Tran and the defendant in this case, Ioannis Korakis. Regio also directed additional individuals, including James Yerby, Jeffrey Salonga and Maria Zoraya Silva, to assist him with a variety of matters surrounding the procurement and redistribution of drugs.

The record reflects that Regio recruited defendant to serve as a drug courier in February of 2002. Shortly thereafter, Regio made arrangements to obtain a large quantity of MDMA from a Canadian source. Thus, in April of that year, defendant and Regio traveled by air from the Eastern District of Virginia to Seattle, Washington, for the purpose of acquiring controlled substances. Defendant, at Regio's direction, then traveled by automobile from Seattle to Vancouver, British Columbia, where he acquired two parcels of unmarked pills. From Vancouver, defendant, while in possession of the pills, traveled by bus to Toronto, Canada, again at Regio's direction. After a three-day bus ride, defendant arrived in Toronto and established contact with Regio. At this time, Regio advised defendant that he was to meet with an Asian woman, Kate Cho, who would take possession of the two parcels of pills from defendant and then transport them to Regio in the United States. Regio further advised defendant that Cho was to receive an additional quantity of "chocolate," or hashish, from another co-conspirator in Toronto, also for delivery to Regio in the United States.

Defendant eventually met with Cho and provided her with the two parcels of unmarked pills that he had acquired in Vancouver. Defendant then traveled by bus from Toronto to Buffalo, New York, where he met with Regio to await Cho's arrival

---

1. Oral argument is dispensed with because the facts and legal contentions are adequately set forth in the existing record and oral argument would not aid the decisional process. *See United States v. Yearwood,* 863 F.2d 6, 7 (4th Cir.1988) (recognizing that "[a] hearing is not required…on a § 2255 motion if the record of the case conclusively shows that petitioner is entitled to no relief").

with the drugs. This plan did not come to fruition, however, as Cho was arrested on April 21, 2002, near Buffalo, New York, while attempting to enter the United States from Canada with a shipment of narcotics hidden inside her vehicle. Following Cho's arrest, agents seized from her vehicle over 33,000 units of what was believed to be MDMA, 6 kilograms of hashish and 500 grams of marijuana. Further laboratory analysis of the 33,000 pills revealed that over 30,000 of the pills actually contained only ephedrine, while the remaining pills consisted of a mixture of MDMA and methamphetamine. Specifically, at the time of her arrest, Cho was found to be in possession of 6,736 grams of ephedrine, 960.8 grams of pills containing MDMA and methamphetamine, 6,044 grams of hashish and 451.7 grams of marijuana.

On July 18, 2002, defendant pled guilty to a one-count Indictment charging him with conspiracy to possess with the intent to distribute and to distribute both a mixture and substance containing a detectable amount of MDMA and a mixture and substance containing a detectable amount of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846. In his written plea agreement, defendant reserved the right to argue at sentencing that he should be held responsible for less than the full amount of drugs seized from Cho at the Canadian border and the government reserved the right to argue that defendant should be held accountable for the full shipment.[2] At the conclusion of the plea hearing, sentencing was scheduled for Oc-

tober 11, 2002, allowing the Probation Officer an adequate opportunity to investigate and prepare a Presentence Investigation Report (PSIR).

Ultimately, in the PSIR, the Probation Officer held defendant accountable for 3,007 pills containing both MDMA and methamphetamine, having a net weight of 960.8 grams,[3] and 6,044 grams of hashish. Under the Drug Equivalency Table set forth at U.S.S.G. § 2D1.1, App. Note 10, these amounts were then converted to equivalent quantities of marijuana, resulting in a total of 1,951.82 kilograms of marijuana. Thus, defendant was initially placed at a guidelines offense level of 32, pursuant to U.S.S.G. § 2D1.1(a)(3) and (c)(4), for conspiring to distribute between 1,000 and 3,000 kilograms of marijuana. Two levels were then added to this base offense level pursuant to U.S.S.G. § 2D1.1(b)(4) because the offense involved a quantity of methamphetamine—in this case the methamphetamine contained in 3,007 of the pills seized from Cho's vehicle at the Canadian border. Two levels were also subtracted from defendant's offense level as he met the safety valve requirements set forth in U.S.S.G. § 5C1.2(a)(1)-(5). Subtracting three additional levels from this total for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, left a total offense level of 29. This total offense level, combined with defendant's criminal history category of I, resulted in a guidelines range of 87 to 108 months imprisonment in this case.

---

**2.** Specifically, paragraph 3 of the plea agreement provides that "[t]he defendant reserves the right, up to sentencing, to contest the amount of drugs attributable to the defendant. The government intends to argue that the defendant is responsible for, at least, all the drugs outlined in the statement of facts as contemplated by the Sentencing Guidelines, including Section 1B1.3, Illustration (a)(1)."

**3.** Pursuant to U.S.S.G. § 2D1.1(c)(1)(A), the net weight of the mixture of substances, for purposes of determining the appropriate offense level, was correctly treated as methamphetamine, as that substance yielded the greater offense level.

The sentencing hearing occurred, as scheduled, on October 11, 2002. In the course of the hearing, defendant, by retained counsel David Bracken, objected to the Probation Officer's decision to hold him accountable for a quantity of methamphetamine.[4] In this regard, defendant argued that he should be held responsible only for those substances of which he was fully aware, namely MDMA and hashish.[5] Following the testimony of DEA Agent Martin Griffin and the arguments of counsel, defendant's objection was overruled on the ground that the Probation Officer properly determined the applicable guidelines offense level on the basis of acts directly committed by, and reasonably foreseeable to, the defendant. *See* U.S.S.G. § 1B1.3(a)(1)(A), Application Note 2 (providing that "the defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband" and that "the requirement of reasonable foreseeability...does not apply to conduct that the defendant personally undertakes, aids, abets, counsels, commands, induces, procures, or willfully causes").

Defendant also objected, by counsel, to the Probation Officer's failure to apply a reduction to his offense level based on his alleged minor or minimal role in the offense, pursuant to U.S.S.G. § 3B1.2. In support of this objection, defendant argued that he served merely as a "mule," or courier for a single drug transaction, that he had no supervisory or managerial responsibilities in the conspiracy, and that he

knew nothing of how the overall drug distribution enterprise functioned. In other words, defendant argued essentially that his limited role in the conspiracy "was to move two parcels from point 'A' to point 'B' in Canada." In response to defendant's argument, the government produced transcripts of several Title III recorded telephone conversations, occurring after defendant had returned to the United States from Canada but before he had learned that Cho had been arrested, that clearly evidenced defendant's significant role in the conspiracy. *See infra.* Thus, following the testimony of the defendant and the arguments of counsel, defendant's role in the offense objection, like his drug calculation objection, was overruled in the course of the sentencing hearing.

In addition to these two substantive objections, defendant, by counsel, also moved for a downward departure at sentencing on two grounds, specifically (i) based on his lack of knowledge of the specific type and quantity of drugs in Cho's possession at the time of her arrest, pursuant to U.S.S.G. § 5K2.0, and (ii) based on defendant's status as a deportable alien,[6] pursuant to U.S.S.G. § 5K2.0, which status, he argued, would subject him to harsher treatment by the Bureau of Prisons. Defendant's motion for a downward departure was denied on both grounds.

At the conclusion of the sentencing hearing on October 11, 2002, defendant was sentenced to 87 months imprisonment— the bottom of the applicable guidelines range—to be followed by three years of supervised release. Defendant did not ap-

---

**4.** This objection was also thoroughly argued in a 17–page written brief filed by defense counsel prior to sentencing.

**5.** In other words, defendant argued that he should be held accountable for 960.8 grams of MDMA, rather than 960.8 grams of methamphetamine, and 6,044 grams of hashish, re-

sulting in a base offense level of 28, rather than 32.

**6.** At the time of sentencing, records from the Immigration and Naturalization Service (INS) reflected that defendant, a citizen of Greece, was granted permanent resident status on September 14, 1974.

peal his conviction or sentence to the Court of Appeals for the Fourth Circuit, as he had waived that right in his written plea agreement.[7] Instead, on October 10, 2003, defendant filed the instant motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255, arguing that his retained counsel, David Bracken, was ineffective in several respects.[8] Each of defendant's arguments in this regard is separately addressed.

## II.

■ A two-prong test applies to ineffective assistance of counsel claims. *See Strickland v. Washington*, 466 U.S. 668, 688–89, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *U.S. v. Lurz*, 666 F.2d 69, 78 (4th Cir.1981). Specifically, a defendant must show, first, that counsel's performance "fell below an objective standard of reasonableness," and second, that "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. That is, the defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. And, in all cases, to prevail on an ineffective assistance of counsel claim, a defendant must overcome the strong presumption that counsel rendered "adequate assistance and made all significant decisions in the exercise of reasonable judgment." *Id.* at 690, 104 S.Ct. 2052.

## III.

■ Defendant first claims that his counsel was ineffective in failing to raise certain arguments and attack the guidelines calculations contained in the Presentence Investigation Report. He specifically argues that counsel failed to object to the Probation Officer's decision to hold him accountable for relevant conduct not charged in the indictment or agreed to in the plea agreement or statement of facts, namely the distribution of methamphetamine and hashish. Defendant is simply mistaken in this regard, as this precise objection was extensively argued by counsel and rejected at sentencing. Indeed, prior to sentencing, Mr. Bracken filed a 17–page brief setting forth defendant's substantive objections to the PSIR;[9] he also zealously objected to the Probation Officer's application of the guidelines in the course of the sentencing hearing, including specifically the Probation Officer's decision to hold defendant accountable for quantities of methamphetamine and hashish. Mr. Bracken reiterated this argument in a motion for a downward departure pursuant to U.S.S.G. § 5K2.0. But, in the end, defendant's objection and motion for a downward departure on this ground were properly rejected. In the circumstances, it simply cannot be said that counsel acted objectively unreasonable, as defendant contends. To the contrary, it appears from the record that Mr. Bracken zealously contested defendant's drug cal-

---

7. In this regard, the plea agreement provides that "the defendant knowingly waives the right to appeal any sentence within the maximum provided in the statute(s) of conviction (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742 or on any ground whatever, in exchange for the concessions made by the United States in this plea agreement."

8. It should be noted that defendant stated in the course of both the plea colloquy and the sentencing hearing that he was fully satisfied with the advice and counsel that he received from Mr. Bracken in this case.

9. Counsel also filed an 8–page memorandum in support of defendant's motion for a downward departure and an additional 5–page sentencing memorandum with numerous attached letters from defendant's friends, employers, co-workers, and family members.

culations and guidelines offense level, both before and during the sentencing hearing.

Moreover, it is also clear that counsel's failure to object specifically to the fact that the Probation Officer determined defendant's base offense level under the guidelines based on relevant conduct, rather than the specific conduct included in the indictment and statement of facts, did not cause defendant any prejudice. Indeed, the guidelines make clear that relevant conduct is properly considered in calculating a defendant's appropriate offense level. *See* U.S.S.G. § 1B1.3 (entitled "Relevant Conduct (Factors that Determine the Guideline Range)").

## IV.

■ Defendant next claims that counsel was ineffective in failing to present the expert opinion of a professional forensic chemist at sentencing in support of defendant's objections to the Probation Officer's drug calculations. Specifically, defendant claims that such an expert would have testified that the 3,007 pills found by DEA forensic analysis to contain both MDMA and methamphetamine were, in fact, only MDMA. Defendant also claims that a forensic chemist would have testified that methamphetamine is a necessary component of MDMA and thus will always be present in MDMA in trace, but detectable amounts.

In his affidavit, Mr. Bracken states that he researched this "interesting" theory, but ultimately found no scientific evidence to support the argument. And, while defendant had requested that counsel retain a forensic chemist to testify at the sentencing hearing as to the chemical similarities of MDMA and methamphetamine, Mr. Bracken, given his independent research and professional judgment, did not believe that retaining such an expert would prove fruitful given the recognized differences between the two controlled substances. In

this regard, Mr. Bracken's independent research correctly revealed that MDMA is a methamphetamine derivative and that both substances indeed have some chemical similarities, as defendant argues. Yet, it is equally clear that the two substances have very different effects on the brain and are properly viewed as separate and distinct drugs, both scientifically and legally under the guidelines.

In addition to the lack of scientific data to support defendant's argument, Mr. Bracken also believed that defendant's best defense lay not in attacking the chemical makeup of the disputed substance, but rather in arguing (i) that defendant did not participate in distributing the methamphetamine, (ii) that he did not know that any co-conspirators would be transporting or distributing methamphetamine, and (iii) that it was not reasonably foreseeable that any co-conspirators would transport or distribute methamphetamine. In the circumstances, and given the settled principle that district courts may not second guess an attorney's tactical decisions if there was a reasonable basis for them at the time, *see United States v. Alexander*, 789 F.2d 1046, 1051 (4th Cir.1986), counsel's decision not to secure an expert opinion from a forensic chemist must be viewed as objectively reasonable in the circumstances.

Yet, even assuming counsel was deficient in some respect by not seeking an expert opinion to support defendant's argument, defendant has failed to establish that he suffered any prejudice as a result of this deficiency. To be sure, the only evidence submitted by defendant to support his novel scientific argument is a letter dated February 3, 2004, from Alice E. Till, Ph.D. Ms. Till, a pharmaceutical scientist, was reportedly asked by a friend of the defendant for her scientific opinion on the DEA lab analysis of the 3,007 pills found to contain methamphetamine in this

case. Based on discussions with current researchers in the field and her own independent research, Ms. Till was precluded "from drawing a conclusion about the origin of the methamphetamine reported by the DEA." She therefore opines "that there are some significant unanswered questions that must, in good conscience, be answered before the DEA laboratory results are used to support legal decisions."[10] Such hypothetical questions, without proven definitive answers, are clearly insufficient to meet the prejudice prong of the *Strickland* standard. Instead, the current record still reflects, as it did at the time of sentencing, that the Probation Officer correctly interpreted the DEA laboratory analysis to hold defendant accountable for 960.8 grams of methamphetamine under the guidelines. *See supra.* Defendant's ineffective assistance of counsel claim on this ground therefore lacks merit.

## V.

▮ Defendant next claims that counsel was ineffective in failing to present testimony or statements from Regio that allegedly would have supported a role reduction to defendant's offense level under U.S.S.G. § 3B1.2. As to this issue, Mr. Bracken states in his affidavit that he believed, correctly so, that the Court had accepted as true and uncontested that defendant had physically transported only the pills containing ephedrine in this case, and that he had not physically transported any of the pills containing methamphetamine. The Court's acceptance of this critical point, combined with defendant's own testimony during the sentencing hearing regarding his role in the offense, and defendant's own statements in the recorded telephone conversations produced by the government, led Mr. Bracken to conclude that Regio's testimony would not add anything substantive to defendant's role reduction argument.[11] In other words, counsel believed that Regio's testimony would have been cumulative of what had already been presented and that its potential value was greatly outweighed by its potential negative effect. Mr. Bracken thus decided, purely for tactical reasons, not to call Regio as a witness at the sentencing hearing. This decision was entirely understandable and objectively reasonable in the circumstances.

Defendant is also unable to demonstrate the requisite prejudice as to this claim, as he cannot establish that the result of the proceeding would have been different had counsel opted to present Regio as a witness, either by way of direct testimony or written statements, in support of defendant's role in the offense argument at sentencing. This is particularly true given the telling statements made by defendant in the course of the recorded telephone

---

10. The questions posed by Ms. Till include the following: (i) "Can contamination during laboratory analysis of the seized tablets be ruled out?", (ii) "[I]s the reported amount [of methamphetamine] an accurate reflection of the actual amount in the tablets?", (iii) "What impact does the fact that the salt form [of methamphetamine] was undetermined have on the reported results?", (iv) "[C]ould the amount [of methamphetamine] reported, or the actual amount present, in the tablets reflect contamination in synthetic processes leading to the inadvertent synthesis of pharmacological subthreshold amounts of d-meth-

amphetamine?", and (v) "Has the reported content of the seized tablets been compared to the usual content of MDMA hydrochloride tablets?"

11. Mr. Bracken claims that the testimony he planned to elicit from Regio at sentencing was limited to actions taken by defendant before he returned to the United States and that Regio's proposed testimony was not of a character sufficient to contradict defendant's own statements made in the recorded telephone calls that occurred after defendant's return to the United States.

conversations produced by the government. For example, in one telephone call, defendant stated to another individual that "[w]e had all used" Cho previously to import drugs into the United States, evidencing his knowledge and involvement in prior drug transactions. In other conversations, after Cho had not returned to the United States with the drug shipment as scheduled, defendant declared that Cho's house had to be "clocked," or watched, and that the co-conspirators needed to "hunt the bitch's scalp." [12] Defendant also stated that he personally wanted "to find this bitch...[and] get her before she gets rid of anything." On another occasion, defendant indicated that someone needed to be "in the bushes just in case...[she] tries to go and get anything from her [expletive] house." Similarly, he told another individual that "we got to get somebody over there, man, we can't...we can't drop the ball of opportunity, [expletive] get her." [13] Defendant also acknowledged in the recorded conversations that Cho, by not returning with the drugs as planned, had placed her "peeps," or family members, in danger.

In addition to the incriminating statements made by the defendant in the course of the recorded telephone conversations, it also appears from the record that defendant was representing the interests of others in connection with the instant drug transaction. In this regard, following his trip to Canada, but before he learned that Cho had been arrested, defendant contacted Chris Potter, a close friend and associate, and Wayne Tren, reporting to them on the status of the drug shipment. Defendant also stated that "many hands" were involved in the drug transaction— namely three different parties—indicating that he was privy to details of the transaction well beyond his status as a courier. It is also relevant to the role in the offense analysis that the amount of drugs transported in this instance was not small, but instead was substantial. *See, e.g., United States v. Withers*, 100 F.3d 1142, 1147 (4th Cir.1996) (noting that a minor role adjustment "would be appropriate only in a case where an individual was recruited as a courier for a single smuggling transaction involving a *small* amount of drugs")(emphasis added).

In sum, the record reflects that Mr. Bracken, contrary to defendant's assertions, argued zealously in favor of a minor or minimal role reduction pursuant to U.S.S.G. § 3B1.2. He argued the matter extensively, both in his written pleading and in oral argument at the sentencing hearing, and he presented the testimony of the defendant in further support of the argument. In the end, however, the record in this case, including particularly the recorded telephone calls presented by the government, reflected that defendant took a very active role in the drug shipment in question. Indeed, the record reflects that defendant assumed a significant role in efforts to transport, and then locate, the missing shipment of drugs. Moreover, in addition to informing his associates of the status of the shipment, he directed others to watch Cho's house in an effort to recover the drugs. In other words, despite anything Regio might have testified to at defendant's sentencing, defendant was clearly not deserving of a minor or mini-

---

**12.** These statements were perceived by law enforcement officers to constitute a credible threat to the personal safety of both Cho and her family members, resulting in the placement of surveillance in front of Cho's residence for a period of time immediately following her arrest.

**13.** Defendant admitted in the course of his testimony at the sentencing hearing that he had asked another individual to search for Cho when she did not return to the United States with the drugs as scheduled.

mal role reduction under § 3B1.2 and his ineffective assistance of counsel argument on this ground is thus properly denied.[14]

## VI.

Finally, defendant claims that his counsel was "involved in a conspiracy to conceal evidence from the court" and that he had a conflict of interest in his representation of the defendant in this case. In essence, defendant claims that Mr. Bracken conspired with others, namely the government prosecutor and Regio's appointed counsel, to keep Regio's "vital testimony" as to defendant's role in the offense from being presented at defendant's sentencing hearing. He also claims that counsel "entered an agreement to protect the client of another attorney at the expense of his own and that the prosecution interfered with the ability of counsel to make independent decisions about how to conduct the defense of his client."

In support of this claim, defendant submits the affidavits of two individuals, John Nicholas Porter and Stamatia Mata Korakis, his sister. Porter, in his affidavit, states, *inter alia,* that he asked Mr. Bracken prior to defendant's sentencing hearing whether he planned to use Regio to establish that defendant had played only a minor role in the conspiracy, to which Mr. Bracken allegedly responded "yeah." After this exchange, but before entering the courtroom, Porter then overheard Mr. Bracken engaged in a conversation with Regio's appointed counsel, during the course of which Mr. Bracken allegedly told Regio's counsel that he was not going to ask Regio to testify. Porter also states that immediately after the sentencing hearing, when Mr. Bracken was asked in the elevator by defendant's family members why he had not followed through with his planned defense strategy, he heard Mr. Bracken respond that he has "to be nice to the DA, [he] might need him in the future."

Stamatia Mata Korakis, in turn, states in her affidavit that immediately prior to the sentencing hearing, she witnessed Mr. Bracken engaged in a discussion with the government prosecutor and Regio's appointed counsel. While Ms. Korakis readily admits that she did not personally overhear the conversation, she states that she was informed by Porter, after the three attorneys had finished their conversation and entered the courtroom, that Mr. Bracken had advised Regio's attorney that he would not call Regio to testify at the sentencing hearing. Then, after the sentencing hearing, Ms. Korakis observed Mr. Bracken engage in "very disturbing and trivial behavior," carrying on with the government prosecutor "in a light-hearted, humorous matter." She, like Porter, also claims that Mr. Bracken stated in the elevator, immediately after the sentencing hearing, that he "has to fulfill the prosecutor's needs if I want him to be nice to me in the future."

Mr. Bracken, for his part, states in his affidavit that he had subpoenaed Regio to appear at defendant's sentencing hearing and, indeed, Regio was transported to the courthouse by the Marshal's Service and was present to testify on that date. Yet, as previously discussed, Mr. Bracken ultimately concluded that Regio's testimony was unnecessary and had the potential for being far more prejudicial than helpful. Again, counsel's decision in this regard was entirely reasonable in the circumstances. *See supra.*

---

14. Indeed, as the Court concluded at sentencing, defendant "clearly plays a bigger role than a low man on the totem pole....He takes a role in saying, 'Look, we've got to scout that lady's house. We've got to get this stuff back.' That's a low man on the totem pole? I don't think so." *See* Sentencing Transcript.

 Moreover, contrary to defendant's contentions, there is absolutely no evidence of a "conspiracy" or conflict of interest in this case. It is equally clear that Mr. Bracken did not in any respect sacrifice the interests of the defendant in favor of the interests of another. To be sure, Mr. Bracken admits in his affidavit that he discussed Regio's proposed testimony with the government prosecutor and counsel for Regio prior to defendant's sentencing hearing. He further admits that the government prosecutor expressed some concern at that time about committing Regio's testimony to the record. Because of this concern, Mr. Bracken discussed with the government prosecutor and counsel for Regio the possibility of entering into a stipulation regarding Regio's proposed testimony. No such stipulation was ultimately necessary, however, as Mr. Bracken opted not to pursue Regio's testimony in the end. And, the fact that counsel may have been willing, at government counsel's urging, to stipulate to Regio's testimony, rather than to have him testify under oath on the stand, is insufficient to amount to a conflict of interest. Rather, such an agreement would have been entirely reasonable in the circumstances. Because of this, defendant's final ineffective assistance of counsel claim necessarily fails.

### VII.

In sum, when viewed in the totality of the circumstances, and attaching due weight to the "strong presumption" that counsel rendered "adequate assistance and made all significant decisions in the exercise of reasonable judgment," *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052, defendant's ineffective assistance of counsel claim must be denied on all grounds.

Accordingly, for the foregoing reasons, it is hereby **ORDERED** that defendant's motion to vacate, set aside or correct sentence, pursuant to 28 U.S.C. § 2255, is **DENIED.**

Should defendant wish to appeal this Order he must do so within sixty (60) days, in accordance with Rules 3 and 4, Fed. R.App. P.

The Clerk is directed to send a copy of this Order to defendant and all counsel of record and to place this matter among the ended causes.